## Amy P. Rawstron Rosenthal *vs.* Paul S. Maney.

No. 99-P-943.

Worcester. October 6, 2000. - April 5, 2001.

Present: Greenberg, Kaplan, & Duffly, JJ.

*Divorce and Separation,* Child custody, Modification of judgment. *Parent and Child,* Custody. *Minor,* Custody.

This court concluded that a request for modification of child custody is distinct from a request of the custodial parent to relocate with the child out of the Commonwealth, and modification of custody must be based on a material and substantial change in circumstances other than the proposed move. [261-262]

A probate judge erred in modifying a prior valid custody order, after the custodial parent requested permission to relocate with the child, without any basis appearing in the record to support a finding and conclusion that a material change in circumstances had occurred. [262-265]

Discussion of the factors a probate judge is to consider in ruling on a request of a custodial parent to relocate with the child outside of the Commonwealth. [265-267]

A probate court judge erred in denying a custodial parent's request to remove her child from the Commonwealth to join her and her new husband in Rhode Island, where the record established a good and sincere reason for the move, and where the judge failed to assess the impact on the custodial parent or on the noncustodial parent and did not give appropriate consideration to the effect of the move on the child. [267-272]

Complaint for divorce filed in the Worcester Division of the Probate and Family Court Department on October 17, 1995.

A complaint for modification, filed on June 23, 1997, was heard by *Susan D. Ricci,* J.

*Carol A. Erskine* for the plaintiff.

*James D. O'Brien, Jr.,* for the defendant.

Duffly, J. A judge of the Probate and Family Court denied the request of the plaintiff, Amy P. Rawstron Rosenthal (mother), who had been adjudicated the primary custodial parent in an earlier divorce judgment, to relocate with the parties'

minor child from the Commonwealth. In the same proceeding, the judge changed physical custody from the mother to the defendant, Paul S. Maney (father), pursuant to his request for modification of custody. From these judgments the mother appeals.

The mother claims that the change in custody was not, as is required by G. L. c. 208, § 28, supported by a material and substantial change in the circumstances of the parties. She argues that neither a custodial parent's relocation, nor a temporary change in custody that was judicially imposed on the parties during the pendency of the proceedings, constitute changes warranting modification of a previously adjudicated custody arrangement. We agree. We also decide that the mother has established a "good, sincere" reason for moving to Rhode Island (to join her new husband, who is employed there), evidencing a "real advantage" for the move. *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 711 (1985) (*Yannas*). This, in combination with the judge's failure to assess or give appropriate weight to other relevant factors, requires reversal.

*Background and proceedings.* We summarize the proceedings, setting forth "relevant background facts as determined by the probate judge . . . supplemented by the record where necessary," *A.Z.* v. *B.Z.,* 431 Mass. 150, 151 (2000), reserving other facts for our discussion of the issues. The parties were married in Worcester on November 22, 1987, and resided during the marriage in Northborough, where their extended families, including both sets of parents, also live. Their only child, Caleb Page Maney (Caleb), was born June 16, 1991. During the marriage, both parties provided for Caleb's care, but the mother was his "primary caretaker and [saw] to the child's daily needs." Since 1990, the mother has been employed as principal second violinist for the Rhode Island Philharmonic Orchestra, commuting to Providence from Northborough during the concert season. The father is, and was throughout the marriage, employed as a service manager for a business owned by his family. In October, 1995, the parties separated. The father moved into an apartment in his parents' home in Northborough. The mother moved with Caleb into an apartment in Shrewsbury, where Caleb attended preschool, then kindergarten. During the parties' separation, the mother began to date Perry Rosenthal.

The parties were divorced by a judgment of divorce nisi entered on January 16, 1997. The divorce judgment incorporated and, with respect to child-related issues, merged the parties' agreement, which was found to be fair and reasonable by a probate judge. Under this agreement, the mother had sole physical custody of Caleb. The father was entitled to visits on alternating weekends from Friday at 5:30 P.M. until Sunday at 7:30 P.M., overnight every Monday and Wednesday, and on specified holidays and observances.

On June 23, 1997, the mother filed a complaint for modification of the divorce judgment in which she sought leave to remove Caleb from Shrewsbury, to Providence, Rhode Island. On July 4, 1997, she married Rosenthal.

The father filed an answer and counterclaim to the complaint for modification on July 8, 1997, alleging that removal would limit visitation with his son, "disrupt the warm and close personal relationship between the [father] and his son and is not in his son's best interests." On this basis he requested physical custody of Caleb. On July 28, 1997, the court appointed a guardian ad litem "to investigate — evaluate — and report in writing" on the issues of removal and custody; "to act as . . . next friend to represent [Caleb's] interests"; and to act as an "investigator to review the matter and report to the Court."

On August 15, 1997, the mother and Rosenthal moved into the house they had purchased in Providence. On August 25, 1997, pursuant to a "Motion For Further Temporary Order" filed by the father requesting that the mother be prohibited from removing Caleb from the Commonwealth until the completion of the guardian ad litem's report[1] and a hearing on the merits, the motion judge (who was also the trial judge) modified the

---

[1]The guardian ad litem filed her first report on September 30, 1997, and an updated report on September 11, 1998, shortly before the first day of trial. In her findings, the probate judge refers to the guardian ad litem's updated report as unauthorized. General Laws c. 215, § 56A, which authorizes the appointment of a guardian ad litem to undertake the kind of investigation here ordered, requires that, "[s]aid guardian ad litem shall, before final judgment or decree in such proceeding [relating to the care, custody, or maintenance of minor children], report in writing to the court the results of the investigation. . . ." Over a year had passed since the guardian ad litem was first appointed on July 28, 1997, to report to the court on the removal and custody issues. There is nothing in the order of appointment to suggest that the role of the guardian ad

existing divorce judgment that gave physical custody of Caleb to the mother, and ordered that the child "reside with the father from Monday after school through Friday delivery to school," and with the mother on weekends.[2] This was a change in custody during the pendency of a complaint for modification of a prior custody order, and must therefore have been based on "specific findings of fact . . . which clearly demonstrate the injury, harm or damage that might reasonably be expected to occur if relief pending a judgment of modification is not granted." G. L. c. 208, § 28A.[3] The record reflects no reason for the order changing custody other than the mother's motion to remove the child to Rhode Island. The order should not have been made.

In the mother's motion for reconsideration of the August 25 order, filed September 18, 1997, she sought reinstatement of the original custody arrangement on the basis that she would be able to reside with her parents in Northborough until a hearing on the merits, and that Caleb's schooling would therefore not be interrupted. The motion was denied without explanation by endorsement on September 26, 1997. The mother's motion requesting that Caleb temporarily be allowed to relocate to Providence was denied on October 9, 1997. Pursuant to

litem was limited to a single report, or limited to providing information to the probate judge in connection with any request for a temporary change in custody. Since both reports were filed subsequent to the judge's August 25, 1997, temporary order changing custody, neither was considered in connection with that order. Both reports of the guardian ad litem were correctly admitted in evidence.

[2]On September 23, 1998, the court granted leave to the father to file an amended counterclaim, in which he alleges as changed circumstances that the child (1) resides with him from "Monday after school through Friday delivery to school and with the mother from Friday after school through Monday delivery to school"; and (2) is enrolled in the Northborough school system.

[3]Unless the parties agree to the temporary change in physical custody, a judicially imposed change in custody is governed by G. L. c. 208, § 28A. There is nothing in the record to indicate that the father (who had not, in his "Motion For Further Temporary Order," requested a change in custody) presented claims warranting the judge's action. The appropriate course would have been to conduct a hearing on the father's request for temporary order and, absent a demonstration of the requisite "injury, harm or damage," to make no change in custody. An evidentiary hearing on the merits of the claims for custody and removal should then have been scheduled on an expedited basis.

o

subsequent temporary orders, the parties established a schedule for holiday and vacation visitation.

Trial on the parties' claims took place on October 2, October 5, and November 12, 1998, well over a year following the entry of the temporary order modifying custody. On January 20, 1999, the court entered a judgment denying the mother's request to relocate and modifying custody in conformity with the temporary orders already in place.

*Modification of custody.* Efforts by a custodial parent to relocate a child out of the Commonwealth often give rise to a claim for custody by the parent not seeking the move. See, e.g., *Hersey* v. *Hersey*, 271 Mass. 545 (1930); *Usen* v. *Usen*, 359 Mass. 453 (1971); *Yannas*, 395 Mass. 704; *Williams* v. *Pitney*, 409 Mass. 449 (1991); *Haas* v. *Puchalski*, 9 Mass. App. Ct. 555 (1980); *Signorelli* v. *Albano*, 21 Mass. App. Ct. 939 (1985).[4] Our decision today, that a request for modification of custody is distinct from a request to relocate and must be based on a material and substantial change in circumstances other than the move, is consistent with these decisions and with G. L. c. 208, § 28 ("the court may make a judgment modifying its earlier judgment as to the care and custody of the minor children of the parties provided that the court finds that a material and substantial change in circumstances of the parties has occurred and the judgment of modification is necessary in the best interests of the children"). The custody claim must be considered in light of established principles governing custody determinations. See, e.g., *Hersey* v. *Hersey*, *supra* at 554; *Grandell* v. *Short*, 317 Mass. 605, 607 (1945); *Yannas*, *supra* at 711-712; *Haas* v. *Puchalski*, *supra* at 557; *Delmolino* v. *Nance*, 14 Mass. App. Ct. 209, 211 (1982).

The original judgment awarded sole physical custody to the mother, and "must be presumed to have been right." *Hersey* v. *Hersey*, *supra* at 554. See *Delmolino* v. *Nance*, *supra* at 211. The probate judge's finding that the mother was the child's primary caretaker during the marriage is consistent with the original award of physical custody to the mother. A judgment

---

[4]See also Richards, Children's Rights v. Parents' Rights: A Proposed Solution to the Custodial Relocation Conundrum, 29 N.M. L. Rev. 245, 246 (1999) ("[r]elocation . . . often precipitates a petition to change custody").

modifying custody must be based on findings grounded in the evidence that, since the date of the prior custody order, there has been a change in circumstances "of sufficient magnitude to satisfy the governing principle by which the court must be guided in these cases, namely, whether the transfer of custody will be conducive to the welfare of the [child]." *Fuller* v. *Fuller,* 2 Mass. App. Ct. 372, 376 (1974). "The uprooting of a child . . . should be done only for compelling reasons." *Tolos* v. *Tolos,* 11 Mass. App. Ct. 708, 710-711 (1981) (citation omitted).

We have reviewed the extensive findings (entitled "Findings of Fact on the Issue of Removal") and summarize below those that arguably could be said to support the judgment. Although it is nowhere stated in her findings that a material change in circumstances had occurred,[5] that conclusion may be inferred from the judge's finding that "the minor child's best interests dictate that . . . the Judgment [of divorce] be modified to include shared physical and legal custody," and her passing reference to the relevant changed circumstances standard.

The probate judge found that, following the divorce, "[b]ecause both parties were working full-time . . . the minor child was in need of and received daycare." She also found that "[t]he Mother's work schedule was quite hectic. . . . [Her] schedule is a combination of odd hours and concert schedules. The Father has some flexibility in his work schedule . . . [as] he is employed by a family-owned business and works in the same town where he lives."

Detailed findings set forth the mother's work history. During the marriage as well as following the parties' separation and

---

[5]The father argues in his brief, without citation to relevant authority or to the record, that the findings "are replete with evidence of a material change in circumstances since the time of the original decree. That the mother has remarried and moved to Providence, Rhode Island with her new husband would implicitly seem to be a change of circumstances that would be natural, especially with its impact on the child." There is nothing in the findings to support the contention that the mother's remarriage had a detrimental impact on Caleb. *Delmolino* v. *Nance, supra* at 211. The only direct reference touching on Rosenthal's relationship with Caleb is the finding that he gives Caleb cello lessons. The findings that "[b]oth parents have safe and secure homes. . . . The minor child is comfortable and has his own bedroom in each party's house," indirectly support the conclusion that the mother's remarriage has had no detrimental impact on Caleb.

divorce, the mother's employment as a professional musician[6] and private violin teacher (and, we assume, the father's full-time employment) required the assistance of child-care providers other than the parents. Other than in Caleb's first year, when childcare was provided by the father's sister, childcare was provided primarily by the maternal grandmother, in addition to other family members and nonfamily caregivers. The maternal grandmother continued to provide childcare two to three days a week after the parties separated and for a time following the divorce. After the separation, the mother, compelled by financial need, took on additional students until the number reached twenty to twenty-five a week. However, in May of 1997, when her imminent remarriage to Rosenthal made it financially feasible, she stopped teaching and accepting extra performance commitments in order to spend more time with Caleb.

We note, first, that a parent who works outside the home, even one with a "hectic" schedule, may still be the appropriate primary caretaker and that, standing alone, such employment would not warrant a custody modification. Second, by the time of trial, the probate judge found that positive changes in the mother's work schedule "allowed her to spend more time with the minor child. For example, she began to drive Caleb to school in the mornings and became a volunteer classroom parent." Thus, to the extent that changes in the mother's work schedule did occur, they were not changes warranting a modification in the custody arrangement.

The trial judge found that both sets of grandparents "live in Northboro . . . and are very involved in Caleb's life and care. Caleb has a close and loving relationship with both his maternal and paternal grandparents, [whom] he sees on almost a daily

---

[6]The mother's rehearsal and performance schedule during the October through May performance season of the Rhode Island Philharmonic Orchestra remains as it was during the marriage. The mother gives a total of sixteen to seventeen performances during the season, all in Providence. This includes seven subscription concerts, most performed on Saturday evenings, for which she rehearses four times during the week preceding the performance, from 7:30 P.M. to 10:00 P.M.; three Pops concerts, also performed on Saturdays, requiring only two rehearsals prior to each performance; and four family concerts on Sunday afternoons, for which rehearsal takes place earlier on the day of the performance. Occasional early morning concerts at local schools make up the total.

basis.[7] [He] also has a close relationship with all of his aunts, uncles, and cousins who live in" the area.

Caleb's close relationship and frequent contact with his extended family predates the divorce. That he remains close to his grandparents and other family members since the divorce reflects a concerted effort on the part of both parents to foster and maintain familial relationships that had existed during the marriage. The findings fail to support the conclusion that it is in Caleb's best interests to change custody to his father in order that he be able to spend portions of his weekdays with his extended family members instead of with his primary caretaker.[8]

The probate judge found, "[b]ecause Caleb spends the majority of his week in Northboro . . . most of his activities take place there." This was a change in Caleb's living arrangements brought about solely as a consequence of the mother's compliance with the August 25 order. That order, entered in the absence of any finding of a substantial and material change in circumstances, let alone the requisite findings of "injury, harm or damage," G. L. c. 208, § 28A, cannot form the basis upon which a final judgment modifying custody is granted. Were we to decide otherwise, tactical delays or overcrowded court dockets could come to dictate the result in every custody modification proceeding, and render meaningless any eventual hearing on the merits.

---

[7]Based on the evidence, Caleb started seeing his paternal grandmother on a daily basis when he began to reside primarily with his father, who since the separation has lived in an apartment attached to his parents' home. Caleb saw his maternal grandmother on a regular basis both during the marriage and after the divorce while the mother still had custody. Since the change in custody, the father's relationship with the maternal grandparents has grown cool. The mother and Caleb visit the mother's family in Northborough every Friday, when she picks Caleb up for her weekend visits. The mother brings Caleb either to her parents' home, or to visit her siblings (she has seven siblings, most of whom live in or near Northborough; one lives with his wife in Rhode Island). She has also brought Caleb to visit members of the father's family. The father (and Caleb) have dinner with the father's girlfriend once a week, his sister's family twice during the week, and his parents once during the week.

[8]We note that, under the original custody arrangement, the father could continue to spend time with his parents and siblings during scheduled weekend and vacation visits with Caleb. Further, in light of the fact that "the mother has a good relationship with her parents and siblings who live in Massachusetts," and her practice of weekly contact with them, it is likely that she would continue to maintain these relationships.

There is nothing in the findings or the record before us to indicate that anything occurred after the divorce that so altered the circumstances of the parties as to warrant a change in custodial arrangements which, on all of the uncontested evidence, had been in place with no ill effect on the child since the parties' separation in October, 1995. To the contrary, the findings reflect that the mother is a loving and appropriate caretaker.[9] The probate judge took note of the fact that both parents love the child, and that "both parents have safe and secure homes. . . . The child is happy in each party's home."

Although great deference is accorded a probate judge's custody determination, "[t]here are limits to appellate deference," as when the judge's action is not supported by the findings, or the findings are not supported by the evidence, as here. *Freedman* v. *Freedman*, 49 Mass. App. Ct. 519, 521 (2000). The judgment modifying custody must be reversed.

*Removal from the Commonwealth.* A request for removal is governed by G. L. c. 208, § 30,[10] as that statute has been interpreted by *Yannas*, 395 Mass. at 710, and *Hale* v. *Hale*, 12 Mass. App. Ct. 812, 815 (1981).[11] A parent's request to relocate with a child from the Commonwealth must be "grounded on

[9] The uncontested evidence also indicates that the mother has maintained her close relationship with the child, driving from Providence to Northborough every Friday to pick Caleb up for the weekend, and on Monday morning to return him to school, as well as at the beginning and end of vacation periods when Caleb is with her one-half the time. She has continued, as she did during the marriage, to communicate with Caleb's teachers, and to volunteer regularly in his classroom. Caleb enjoys living in Providence, has a good relationship with his stepfather, and has friends in the neighborhood. In addition, we note that Caleb expressed to the guardian ad litem at the outset of the investigation his preference to reside primarily with his mother, and he reiterated this preference at the conclusion of the investigation, shortly before trial. Although not dispositive of the custody issue, *Ardizoni* v. *Raymond*, 40 Mass. App. Ct. 734, 738-739 (1996), these factors, at the very least, suggest that Caleb might quickly readjust to living with his mother during the week, and visiting his father on weekends and during part of each school vacation.

[10] A minor child of divorced parents "shall not, if of suitable age to signify his consent, be removed out of this commonwealth without such consent, or, if under that age, without the consent of both parents, unless the court upon cause shown otherwise orders." G. L. c. 208, § 30.

[11] General Laws c. 208, § 30, was previously considered ancillary to the court's continuing jurisdiction to modify divorce judgments as to the care and custody of children. *Hersey* v. *Hersey*, 271 Mass. at 549. See *Gallup* v. *Gal-*

the 'realization that after a divorce a child's subsequent relationship with both parents can never be the same as before the divorce . . . [and] that the child's quality of life and style of life are provided by the custodial parent.' Although the best interests of the children always remain the paramount concern, '[b]ecause the best interests of a child are so interwoven with the well-being of the custodial parent, the determination of the child's best interest requires that the custodial parent be taken into account.' " *Yannas, supra* at 710, quoting from *Cooper* v. *Cooper*, 99 N.J. 42, 53-54 (1984). See *Hale* v. *Hale, supra* at 815-818, quoting from *D'Onofrio* v. *D'Onofrio*, 144 N.J. Super. 200, 204-206, aff'd per curiam, 144 N.J. Super. 352 (1976) (a court must consider the advantages of the move in terms of whether the move is likely to improve the general quality of life for both the custodial parent and the child, the "new family unit"[12] ). These considerations lie at the root of the specific factors described in *Yannas*, collectively referred to as the "real advantage" standard. We proceed to discuss the extent to which the probate judge's findings and conclusions reflect appropriate consideration of each of the requisite elements.

*Real advantage/good and sincere reason for the move.* In

lup, 271 Mass. 252, 257-258 (1930) ("We regard the exercise of prohibition of removal from Massachusetts as properly incident to the performance of the duty with which the court is charged of securing the care, custody, education and maintenance of the child.") With the enactment of State and Federal statutes enlarging the court's jurisdictional reach to parents and children moving beyond the borders of the Commonwealth, there was no longer a compelling need to prevent removal of children in order to maintain ongoing jurisdiction over issues relative to their care and custody, see, e.g., G. L. c. 209B, § 2 (Massachusetts Child Custody Jurisdiction Act); G. L. c. 209D, § 2-205 (Uniform Interstate Family Support Act); 28 U.S.C. § 1738A (1994) (Parental Kidnapping Prevention Act); G. L. c. 223A, §§ 3(*g*) & (*h*) (long-arm statute), and our courts have interpreted the language, "upon cause shown," as permitting removal if in the best interests of the child. *Rubin* v. *Rubin*, 370 Mass. 857 (1976). The criteria for determining such best interests were set out in *Hale* v. *Hale, supra*, and *Yannas, supra*.

[12] "The new family unit consists only of the children and the custodial parent, and what is advantageous to that unit as a whole, to each of its members individually and to the way they relate to each other and function together is obviously in the best interests of the children. It is in the context of what is best for that family unit that the precise nature and terms of visitation and changes in visitation by the noncustodial parent must be considered." *Hale* v. *Hale*, 12 Mass. App. Ct. at 818 (citation omitted).

weighing the factors to be considered, "the first consideration is whether there is a good reason for the move, a 'real advantage.' " *Yannas, supra* at 711. This is determined by assessing "the soundness for the reason for moving and the presence or absence of a motive to deprive the noncustodial parent of reasonable visitation . . . ." *Ibid.*

The mother's reasons for relocating to Providence — which include the fact that she has remarried; that her new husband is a long-time Rhode Island resident employed in Providence[13]; and that the mother's primary employment is in Providence — establish a "good reason" for the move. See *Yannas, supra* at 712 (move to Greece where mother found new job and would be geographically close to her relatives "would be to [her] advantage"); *Williams* v. *Pitney*, 409 Mass. at 455 (that mother found employment and would live near her relatives in California were "good and sincere reasons"); *Signorelli* v. *Albano*, 21 Mass. App. Ct. at 940 (that mother had remarried, given birth to a child of the new marriage, and new husband obtained higher paying job in New Jersey were "good and sincere reasons" for move); *Vertrees* v. *Vertrees*, 24 Mass. App. Ct. 918, 919 (1987) (that mother wanted to move to Illinois because her relatives there would provide emotional support and social interaction was "good and sincere reason"). There was no finding, nor is there evidence in the record to support a finding, that the mother was motivated to deprive the father of reasonable visitation. The probate judge's conclusion that "the Mother's request to remove the minor child from the Commonwealth . . . is not founded on a good, sincere advantage," was clearly erroneous, meaning it was not supported by the evidence. See *Yannas, supra* at 709-710.

We turn now to the judge's consideration of the interests of the child, the mother, and the father, in light of factors established by *Yannas*. "If the custodial parent establishes a good, sincere reason for wanting to remove to another jurisdiction, none of the relevant factors becomes controlling in decid-

---

[13]Rosenthal, like the mother, is a musician performing with the Rhode Island Philharmonic Orchestra. He is also an account executive at AT&T, and his office is located in downtown Providence. The mother and Rosenthal live five minutes from where they perform with the orchestra.

ing the best interests of the child, but rather they must be considered collectively." *Id.* at 711-712.

1. *Interests of the child.* (a) *Improvement in child's quality of life.* The probate judge was bound to consider "whether the quality of the child's life may be improved by the change (including any improvement flowing from an improvement in the quality of the custodial parent's life) . . . ." *Id.* at 711. The probate judge concluded that "[t]he Mother has not provided any evidence which is tantamount to finding such a removal would be an improvement upon this child's life. The evidence indicates that such removal would be disruptive to this child's life." We first note that it was not the mother's burden to provide evidence of improvement, but that the factors must be considered collectively. "The judicial safeguard of [all parties'] interests lies in careful and clear fact-finding and not in imposing heightened burdens of proof." *Id.* at 712.

The probate judge's subsidiary findings supporting her conclusion focus on Caleb's relationship with his father and adjustment to the court-imposed change in physical custody.[14] There were no findings reflecting consideration of "the relationship of the mother to the [child]," *Hale* v. *Hale*, 12 Mass. App. Ct. at 815, or "any improvement flowing from an improvement in the quality of the custodial parent's life." *Yannas*, 395 Mass. at 711.

That there were improvements in the mother's quality of life is evident from the findings. They reflect that, upon her remarriage, "the Mother's financial situation greatly improved." She was able to discontinue the private music lessons that had resulted in a schedule the mother "found stressful and impacted her time with the child." The mother's one-hour commute to and from work was reduced to five minutes. She enjoyed access to the city's cultural offerings. These facts incontrovertibly establish the positive improvements resulting from the mother's move to Providence. That, as the judge found, "[h]er decision

---

[14]Finding no. 52: "Caleb has stability in his life. He has adapted well to the routine where he spends the school week at the Father's rural home and the weekends at the Mother's home in Providence." Finding no. 53: "Caleb is flourishing in the Northboro school system. He is a well-adjusted, bright, and happy child." Finding no. 54: "Removal . . . would pose as an unnecessary interruption to this child's otherwise steady and promising education."

to move was her lifestyle choice," does not dictate the conclusion that the benefits of the move to the mother would not also be experienced by the child, particularly where, as here, the mother had been the child's primary custodian.[15]

(b) *Effect of move on child's association with noncustodial parent.* No findings were made that specifically address the effect on Caleb of a possible "curtailment of the child's association with the noncustodial parent," in the event of relocation. *Id.* at 711. In light of the fact that the distance between Northborough and Providence is but fifty-five miles and has not precluded significant access to both parents, it is likely that by living in Providence the effect on Caleb's association with the father would be no greater than the effect on the child's association with the mother if he were to remain in Northborough.

(c) *Effect of move on child's emotional, physical, or developmental needs.* The probate judge's findings reflect some consideration of "the extent to which moving or not moving will affect the emotional, physical, or developmental needs of the child." *Yannas, supra* at 711. *Hale* v. *Hale, supra* at 817-820. Caleb was found to be a "physically and emotionally healthy" boy whose "frequent, continuing and equal interaction . . . with each parent is most beneficial to him." "Both parents serve as equally important guides for this child's continued healthy development." "The Court finds the minor child's life is enriched by each parent's equal participation in his upbringing." These findings would not support a decision denying

---

[15]That there were improvements in Caleb's quality of life as a result of the move is amply supported by the uncontroverted evidence. While living in Shrewsbury the mother worked at several part-time jobs to make ends meet, in addition to commuting one hour each way to Rhode Island. This impaired the amount of time she had to spend with Caleb. Caleb lived with his mother in a small basement apartment in an apartment complex in Shrewsbury that had no playground and few children of Caleb's age. Caleb had no friends in the complex. The judge found that on April 20, 1997, the apartment was broken into, causing the mother to feel unsafe and frightened of staying there.

By contrast, the move to Rhode Island reduced the mother's commute to five minutes and she was able to quit most of her part-time jobs, giving her more time to spend with Caleb. The mother's three-story duplex in Rhode Island is in a well-to-do neighborhood of primarily owner-occupied residences. There are several parks, playgrounds, schools, bike paths, and a Jewish Community Center nearby. Caleb plays with several children his age who live in the neighborhood.

removal. However, the probate judge's findings reflect consideration of other circumstances affecting Caleb's development and emotional well-being that, in the judge's view, tipped the balance in favor of Caleb remaining in Massachusetts.

The first was that, since the entry of the August 25 order, "the joint legal and physical custody arrangement has been carried out successfully by each parent," and the judge announced herself satisfied with Caleb's adjustment to it. Caleb was found to be doing well in school, where he had made friends and excelled academically. However, there are no findings, and no evidence suggesting, that Caleb would not continue to do well emotionally, physically, and developmentally if the removal were allowed. There are, to the contrary, findings that the order denying removal and changing custody from the mother was disruptive to the child.[16]

A second factor that appears important to the judge's conclusion that removal is not in Caleb's best interest is his close relationship with his grandparents and other members of his extended family living in or near Northborough. While we recognize that a child may have important relationships extending beyond those of his immediate family members that deserve protection, *Youmans* v. *Ramos*, 429 Mass. 774, 782-784 (1999); *E.N.O.* v. *L.L.M.*, 429 Mass. 824, 828-829 (1999), there is nothing in the record to indicate that, here, those relationships are so important to Caleb's emotional well-being that they deserve primacy over his relationship with his mother, who had been the primary custodial parent throughout Caleb's life. In any case, the evidence is clear that the mother has continued, even after the change in custody, to assure Caleb's ongoing contact with extended family members, that she is close to her family, and would continue to foster contact with them and with members of the father's family.

2. *Interests of custodial parent.* There are no findings that indicate consideration of the interests of the mother in maintaining both her close relationship with Caleb, and in living with

---

[16]The judge found that Caleb "[went] through a transition period when temporary joint custody was awarded to the parties and the Mother moved to Rhode Island. At that time, the child had in fact experienced some changes in his behavior, mostly consisting of instances of aggression or passivity."

her new husband in the city in which he and the mother both work. The denial of the mother's request to relocate, and the order changing custody because she made that request, left the mother with the choice of living with her husband and suffering separation from her child, or living with Caleb and suffering separation from her husband. The probate judge "did not appear to give much weight to the quality of life of the custodial parent by reason of the separations enforced on her," *Signorelli* v. *Albano*, 21 Mass. App. Ct. at 940, as a consequence of her decisions.

3. *Interests of noncustodial parent.* The court must consider "the possible adverse effect of the elimination or curtailment of the child's association with the noncustodial parent." *Yannas*, 395 Mass. at 711. In this context, "[t]he reasonableness of alternative visitation arrangements should be assessed. The fact that visitation by the noncustodial parent will be changed to his or her disadvantage cannot be controlling." *Ibid.* There is nothing in the evidence to suggest that a relocation to Providence, fifty-five miles from Northborough, would preclude the father (whose work schedule was found to be "flexible") from having contact with Caleb in a manner significantly different from that provided by the original divorce judgment.

That there would be some impact we infer from the fact that the father generally picks Caleb up from his after-school day care program and the fact that Caleb is involved in "a variety of programs," including gymnastics and swimming lessons and soccer. By all accounts he is an attentive and loving father, and we assume that he participates in these activities by his attendance. But the test is not whether there is no impact on the father's association, but whether reasonable "alternative visitation arrangements" might achieve ongoing and meaningful contact appropriate to the circumstances. There were no findings that such visits could not be arranged. Transporting Caleb on a weekly basis pursuant to the current visitation schedule was found by the judge to be accomplished "with ease," and with little burden on the mother.[17] That it might work a somewhat greater burden on the father, who works full-time, is

---

[17]Finding no. 55: "The Court finds that the Mother can continue to drive to Massachusetts to pick up the minor child for her parenting time with relative

not dispositive. The fact that both the mother and her husband perform with the Rhode Island Philharmonic Orchestra on many Saturdays and some Sundays during the October through May season suggests a weekend visitation schedule that is eminently workable. "From what we can ascertain, the judge recognized the importance of the 'frequent and continuing contact' of the child with both its parents . . . and entered [her] judgment prohibiting removal on the basis that the move would make visitation more difficult. We consider that factor not in itself conclusive." *Hale* v. *Hale*, 12 Mass. App. Ct. at 815 (citations omitted).

*Conclusion.* Based on this record, "[a] remand for findings of fact to support the judge's order is unnecessary, because the evidence, weighed under the relevant factors . . . convincingly establishes that the plaintiff's request should have been allowed." *Gridley* v. *Beausoleil*, 16 Mass. App. Ct. 1005, 1006-1007 (1983). The judgment denying removal and awarding custody to the father is reversed. We remand for the entry of a judgment that the custody of the parties' minor child remain with the mother, that she may relocate with the child to Rhode Island, "and for such further proceedings consistent with this opinion relative to time and conditions of visitation." *Haas* v. *Puchalski*, 9 Mass. App. Ct. at 558. In the absence of agreement, the Probate Court may consider whether it is in Caleb's best interest to conclude the current school term in Northborough and to begin the next school term in Providence, or transfer to a new school in Providence forthwith.[18]

*So ordered.*

---

ease. The Mother has managed to travel for eight (8) years back and forth from Massachusetts to Rhode Island. The Mother traveled weekly to Rhode Island during the parties' marriage. After the parties divorced, the Mother traveled regularly to Rhode Island to work. When the Mother moved to Rhode Island, she then traveled weekly to Massachusetts to pick up and drop off Caleb without any significant burden. The travel time of one hour each way is not unreasonable under the current custody schedule. Also, the Mother's traveling to Massachusetts is not unreasonable given the fact that the maternal grandparents and various other maternal relatives reside in Massachusetts."

[18]We do not preclude, if warranted by the circumstances and upon the filing of an appropriate complaint, consideration of any relevant material and substantial changes in the parties' circumstances occurring since the date of the judgments appealed from. *Ardizoni* v. *Raymond*, 40 Mass. App. Ct. at 741.