PAMELA DICKENSON *vs.* W. CLEVELAND COGSWELL.

No. 05-P-543.

Middlesex. February 13, 2006. - June 5, 2006.

Present: PERRETTA, KAFKER, & GREEN, JJ.

*Divorce and Separation,* Modification of judgment, Child custody.

A probate judge properly denied the request of a divorced mother and custodial
parent to remove her minor child from Massachusetts (where the child's
father lived) to California (where the mother's new husband resided, and
where the mother planned to base a new telecommuting relationship with
her Massachusetts employer), on the ground that notwithstanding the
sincerity of the mother's reasons for removal (i.e., being with her new
husband), the collective balancing of interests nevertheless established that
removal would not be in the child's best interests, as it would force the
child into a bi-coastal existence involving frequent overnight flights for
visitation purposes; diminish the child's financial security; and negatively
impact the father-child relationship. [447-453]

COMPLAINT for divorce filed in the Middlesex Division of the
Probate and Family Court Department on November 13, 1997.

A complaint for modification, filed on February 13, 2003,
was heard by *Edward F. Donnelly, Jr.,* J.

*Abbe L. Ross* for the plaintiff.

*John Foskett* for the defendant.

KAFKER, J. The mother, the custodial parent, appeals from the
denial of her request to remove the parties' minor child to
California, where the mother's new husband had moved. As the
family's primary source of financial support, the mother planned
to retain her job in Massachusetts and telecommute. She would
spend three weeks out of every four in California and the
remaining week in Massachusetts. Her alternative visitation
plan included having her ten year old child take frequent
overnight ("red eye") flights to see his father, with whom he
was close. The Probate and Family Court judge denied the
removal request. We affirm.

1. *The judge's findings.* a. *Background.* The mother, Pamela Dickenson, and the father, W. Cleveland Cogswell, were married in 1986. Soon thereafter, the father adopted the mother's ten year old son from a previous marriage. The parties subsequently had a second child together, a son born in 1994. The younger child is the subject of this appeal.

"During [the child's] early years, [the mother and father] were co-parents who shared child care responsibilities."[1] The mother would take the child to day care, while the father would pick him up from day care at about 5:30 P.M. and be responsible for him until the mother returned from work at around 7:00 P.M. From the time the parties separated in 1996 until their divorce in 1998, the parenting schedule remained the same.

In 1998, a probate judge granted the parties a judgment of divorce nisi. The judgment incorporated and merged the child-related provisions of the parties' separation agreement and incorporated, but did not merge, the remaining provisions. The shared parenting section of the separation agreement provides that the mother and father would share legal custody of the child and that the mother would have physical custody. The agreement further provides that the father "shall have access to said child at all reasonable times and places, including but not limited to . . . one weekend each month; one Saturday each month; one overnight during the work week; the weekend after their son's birthday; every Father's Day; one full week during each of the following periods: January and May; June and September; and October and December (a total of three weeks); and additional times to assist the wife with her work schedule; and all holidays as agreed upon . . . ."

After their divorce, "the parties did not adhere to the parenting and visitation plan in their separation agreement. In practice, the parties were co-parents, engaging in good communication and exercising a flexible approach to visitation." Beginning sometime in 2000, the father reduced his time with the child because of his increased work responsibilities. Also in 2000, the mother met and began dating Mark Salwasser.

In 2001, the mother commenced her current job as a sales

---

[1] All quotations in part 1 of the opinion, unless otherwise indicated, are taken from the Probate and Family Court judge's findings.

operation manager at Smith & Nephew in Andover, where she earns approximately $100,000 per year. In April of that year, the father took a severance package from Fleet Bank and remained unemployed until July, 2002. At some point during this time period, the father met his current wife. He also rented a condominium to be closer to the child. From September, 2001, until May, 2002, he saw the child "almost daily."

In September of 2002, the mother married Salwasser, who sold his home and moved in with the mother and child in their home in Andover. Salwasser undertook "homemaker" responsibility for the family: he ran errands, he cooked, and he cleaned. That same month, Salwasser purchased a home in his name in Arroyo Grande, California, with the proceeds of the sale of his Massachusetts home. The mother pays all the costs associated with the Arroyo Grande house.

Also in September of 2002, the father learned from the child that the mother wanted to relocate to California. After initially describing the relocation as only a possibility and denying any immediate plans to move, the mother confirmed in November, 2002, that she planned to move to California with Salwasser.

The judge found that both parents were able and that "[u]ntil early 2003, when tensions arose over relocation, the parties communicated well and shared time flexibly with [the child]." In the spring of 2003, the father began working for his current employer, Webster Financial Services, a bank located in Connecticut, and began commuting 115 miles from his home in Newton to the bank, which takes one hour and forty minutes each way. He saw the child on Thursday nights and every other weekend. The father married his current wife in June, 2003. In November, 2003, the mother put her Andover home on the market, and after it was sold, she moved to her present apartment in Lawrence where she lived with her child and Salwasser. Salwasser moved to Arroyo Grande in August, 2004, a few weeks before trial commenced.

b. *The proposed move.* The judge found that the mother desires to move to Arroyo Grande to be with her husband; that the mother's "motivation in removing to California is not to deprive [the father] of contact with [the child]"; and that the mother "sincerely believes that a strong relationship between

[the father] and [the child] is important, and, if her request to remove is granted, she will aim to minimize the impact of the move on [the father] in terms of finances and time with [the child]."

Prior to trial, the mother and current employer agreed that she would work remotely in California for three weeks per month and that she would fly to Massachusetts for one week every month at her employer's expense. The judge acknowledged that the mother "believes that this working arrangement will allow her more time with [the child] because she would work from home and complete her day by 6:30 P.M. [Eastern Standard Time] or 3:30 P.M. [Pacific Standard Time]."

Salwasser was born in California, but lived on the east coast from 1971, and in Massachusetts from the mid-1980's until, as noted above, August, 2004. His parents, who are in their mid-eighties, reside in California. Their primary residence is in Clovis, California, 162 miles and a two and one-half hour drive from Salwasser's home in Arroyo Grande. Salwasser's parents also own a beach cottage twenty minutes away from Arroyo Grande. Beginning in 2002, Salwasser began traveling back and forth from California to Massachusetts to visit his parents approximately once each month.

When the trial began, Salwasser, who prefers part-time employment, did not have a job in California. However, by the end of the trial Salwasser reported that he had received an offer of part-time employment to develop after-school programs for elementary and high school students for $1,300 per month. Salwasser had not, however, moved to California in hope of obtaining this job. The mother will remain as the primary source of financial support for the family.

The judge found that the mother "may benefit emotionally from moving to California because she will be with her husband . . . , but she will not benefit economically or socially. Her employment will become less secure, she frequently will travel away from home, and she will be living far from her New England friends and family."[2] The judge concluded that

---

[2]The boy's extended paternal and maternal families live mostly in New England, including his brother. "Although [the] mother has an uncle in

there "is no real advantage to [the mother] in moving to California."

c. *The best interests of the child.* The judge found the following. The child was a well-adjusted, polite and friendly ten year old at the time of the trial and had no special needs. He had a good relationship with his parents and stepparents. The father and the child "have a very close father-son relationship [and the father] has been deeply involved with his son's life." The father visited with the child every week, coached several of the child's sports teams, and took the child on numerous skiing, hiking, and camping vacations. The child will miss the father, who has been a "steady and important presence" in his life. "It is in [the child's] best interests to have regular contact with [the father]."

The mother proposed a visitation schedule where the child would fly to Boston twelve times per year at a cost of $5,700.[3] She would accompany him on all of the flights to Boston, but not on all of the returning flights. Many of the trips in her proposal include "red eye" flights, which would require a layover and flight change in Las Vegas, as there are no direct flights between Boston and San Luis Obispo, the nearest airport to Arroyo Grande. The father would also fly to visit the child one weekend per month. The judge found that the mother had taken "pains to submit a thoughtful and flexible visitation proposal," but that the proposal was "impractical and unreasonable." Not only was it financially burdensome, but "flying cross country at least once per month, particularly on overnight flights, will be tiring [for the child]. It could [also] be stressful for him to travel so frequently as an unaccompanied minor." The possibility of the child being stranded alone in Las Vegas also concerned the judge.

The judge "[found] that moving to California is not in [the child's] best interests." Accordingly, the judge denied the mother's request for permission to remove the child to

California and some friends in San Francisco, her roots, friends and family are in New England." The mother is originally from Maine. She has numerous siblings in New England.

[3]Her flights would be paid for by her employer, her child's by her.

California, and it is from this denial that the mother now appeals.[4]

2. *Discussion.* A custodial parent may not remove a minor child from the Commonwealth "without the consent of both parents, unless the [probate judge] *upon cause shown* otherwise orders" (emphasis added). G. L. c. 208, § 30, as amended by St. 1986, c. 462, § 9. "The words 'upon cause shown' mean only that removal must be in the best interests of the child." *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 711 (1985) (*Yannas*).

In *Yannas, supra* at 711-712, the Supreme Judicial Court provided general guidance, listed relevant factors, and established a two-part inquiry for removal cases. The court emphasized the difficulty of removal cases and cautioned that "the issue can be resolved only on a case by case basis." *Id.* at 711. In setting forth the factors to be considered in such cases, the court stressed that "[t]he effect on the child of any removal is most important." *Ibid.* The court continued: "An evaluation of the best interests of the child requires attention to whether the quality of the child's life may be improved by the change (including any improvement flowing from an improvement in the quality of the custodial parent's life), the possible adverse effect of the elimination or curtailment of the child's association with the noncustodial parent, and the extent to which moving or not moving will affect the emotional, physical, or developmental needs of the child." *Ibid.* The interests of both the custodial and the noncustodial parents must be considered, including an assessment of alternative visitation arrangements for the noncustodial parent. *Ibid.*

To structure this analysis, the court proposed a two-part inquiry. "The first consideration in the process of determining the best interests of a child is whether there is a 'real advantage' to the move." *Williams* v. *Pitney*, 409 Mass. 449, 453 (1991), quoting from *Yannas, supra* at 711. This requires that the custodial parent establish "a good, sincere reason for wanting to remove to another jurisdiction[.]" *Yannas, supra.* Here, judges consider both "the soundness of the reason for moving, and the

---

[4]The mother retained physical custody of the child and still lives in Massachusetts.

presence or absence of a motive to deprive the noncustodial parent of reasonable visitation." *Ibid.* See *Rosenthal* v. *Maney*, 51 Mass. App. Ct. 257, 267 (2001) (*Rosenthal*). The focus at this stage is on the reasoning of the custodial parent.

"If the custodial parent establishes a good, sincere reason for wanting to remove to another jurisdiction, none of the relevant factors becomes controlling in deciding the best interests of the child, but rather they must be considered collectively." *Yannas*, 395 Mass. at 711-712. *Rosenthal*, *supra* at 267-268. At this second stage "[e]very person, parent and child, has an interest to be considered. The judicial safeguard of those interests lies in careful and clear fact-finding . . . ." *Yannas*, *supra* at 712.

a. *Reasons for the move.* The judge had no doubt that the mother's reasons for removal were sincere. She was not motivated by a desire to disadvantage the father or impede his relationship with the child. Rather, she recognized the importance of preserving that relationship. She also had an obvious, sincere reason for the move: to accompany her new husband, who wanted to move to California.

The judge here decided that a sincere desire to accompany a new spouse to a new location could be found not to be a good reason for a move. He made detailed findings on this issue. Although we conclude that his findings have evidentiary support, we consider a judicial evaluation of the soundness of a sincere decision to move to be with a new spouse to be an extremely sensitive and problematic inquiry. We are, therefore, reluctant to decide that the mother's sincere desire to follow a new spouse, even where this decision will impose great burdens on her, is not a "good" reason for the move for the purposes of requiring the full balancing of interests set out in the second, and most important, part of the analysis required by *Yannas*.[5] In these very difficult family circumstances, it is in the collective balancing of interests that the ultimate decision regarding the move is best made. Out of appropriate caution, the trial judge made the necessary findings for this analysis as well, so we have a full record on which to proceed. Finally, and most

---

[5]We note that the trial judge's determination that the mother did not provide a good reason for the move, and therefore, the move did not present a real advantage to her, involves a legal conclusion as well as subsidiary findings.

importantly, we need not rest our conclusion regarding the ultimate decision on the first part of the trial judge's analysis, because the collective balancing of interests under the second part of his analysis independently establishes that removal was not justified.

b. *Interests of the child.* In the collective balancing of interests called for in *Yannas,* 395 Mass. at 711, the probate judge first considers the effect of removal on the child's interests. See *Rosenthal,* 51 Mass. App. Ct. at 268. The judge determines the extent to which a move will improve the child's quality of life, the potential effect on the child's relationship with the noncustodial parent, and the ramifications of the move on the child's emotional, physical, and developmental needs. *Yannas, supra.* See *Rosenthal, supra* at 268-269.

Here, the probate judge concluded that it would not be in the child's best interests to move to California. As the judge found, the child's current location allows him to be with both of his able parents and his extended family in New England. The judge found that, if his mother moves to California, this pre-teen would be forced into a bicoastal existence in which he would take frequent "red eye" flights across the country, including trips by himself with layovers in Las Vegas. These trips would be tiring for him and, particularly when he traveled alone, stressful. His mother would also be away from him and their home for one week every month, and she too would be living a bicoastal life. The benefits to the child would be the mother's increased happiness from being with her husband when she was home and her availability to the child after 3:30 P.M.

The child's financial security would also be diminished by the move. The judge found that economically the move would be detrimental, rather than beneficial. To support her family, the mother would live in California and telecommute to work for her employer located in Massachusetts. The judge reasonably inferred that "[e]ven in this time of high-speed [I]nternet connections and video conferencing, [the mother], the family's past, present and future primary source of financial support, is embarking on a less-stable employment relationship in order to move to California." Contrast *Rosenthal,* 51 Mass. App. Ct. at 267 (family's financial situation "greatly improved" by move

to Rhode Island); *Signorelli* v. *Albano*, 21 Mass. App. Ct. 939, 940 (1985) ("new husband had moved from Massachusetts to New Jersey because of . . . an increase in salary from $60,000 to $95,000 annually, plus a stock interest of $1,700,000 . . .").[6] The cost of flying the child back and forth will also pose a significant financial burden on the family.

"Most troubling" for the judge was the "likely effect of the move on [the child's] relationship with [the father]." The father has been a regular part of the child's everyday life in Massachusetts, coaching the child's athletic teams, picking him up from school or day care, and facilitating the child's relationships with his brother and other relatives. This would no longer be possible if the child lived in California: spending time with his father would require significant, costly, and tiring air travel.

The judge found that the "negative impact on the father-son relationship is the most significant aspect of how the move will affect [the child's] emotional, physical or developmental needs." With respect to those needs, the probate judge found that the child would likely "succeed regardless of whether he moves. . . . He is an adaptable and good-natured child who is likely to transition smoothly to a new school and make new friends.[7] He has no particular emotional, physical or developmental needs that require special attention. . . . On the balance, [the judge found] that, apart from the negative emotional impact [the child] will experience from greater distance from [the father], the move or lack thereof will not greatly affect his physical or developmental needs."

c. *Interests of the custodial parent.* The probate judge must next consider the welfare of the custodial parent. *Yannas*, 395 Mass. at 711. See *Rosenthal*, 51 Mass. App. Ct. at 270. The court in *Yannas*, *supra* at 710, quoting from *Cooper* v. *Cooper*, 99 N.J. 42, 54 (1984), recognized that, postdivorce, the relationships of children with their parents would not be the same and

---

[6]In *Signorelli* v. *Albano, supra* at 940, where trial was held before *Yannas* was decided, this court remanded because the trial judge had prohibited the removal of the child, but had not given appropriate weight to the quality of life of the custodial parent.

[7]The judge found that the child likes his school in Massachusetts and enjoys a number of friends in Newton and Andover.

that "because the best interests of a child are so interwoven with the well-being of the custodial parent, the determination of the child's best interest requires that the interests of the custodial parent be taken into account." See *Hale* v. *Hale*, 12 Mass. App. Ct. 812, 815 (1981). The probate judge set out the benefits and detriments of the move to the mother.

Importantly, the move would allow her to live together with her new husband in the same household in a "happy and fulfilling" marriage. It would also allow her to be home at 3:30 P.M. and to spend more time with her family when she was in California. On the other side of the equation, one week out of every month she would be working in Massachusetts away from her child and her new husband. The judge concluded that her "life will become one of constant motion, divided between two coasts." As explained above, the judge reasonably inferred that her job, which provides the primary support for the family, would also become less secure. Socially, the move to California would bring her closer to her husband, but would take her away from her support network of friends and family, including her older son, who are all in New England. Compare *Williams* v. *Pitney*, 409 Mass. at 456 (mother would benefit from the move, "would be close to friends and relatives who would provide emotional support after the move, and . . . would be better able to secure employment").

d. *Interests of the noncustodial parent.* Lastly, the probate judge must consider the interests of the noncustodial parent. *Yannas*, 395 Mass. at 711. See *Rosenthal*, 51 Mass. App. Ct. at 271. In this regard, as noted above, the judge must assess the reasonableness of alternative visitation arrangements. *Yannas, supra.* The probate judge observed that the father "has made significant efforts to see and maintain a close relationship with [the child]," and that this relationship "will change drastically as a result of the move." The father would be required "to travel regularly to California to visit with [the child]." Travel itself would consume valuable time and energy. Regardless of who was visiting whom, someone would inevitably be tired and stressed, even if the planes arrived on time, thereby diminishing the quality of the visits. Ample evidence supported the probate judge's conclusion that the child's "relationship with his father

will suffer from reduced contact." Contrast *Signorelli* v. *Albano*, 21 Mass. App. Ct. at 941 n.3 (mother was willing "for the child to have frequent visits with the father" and transportation costs from Massachusetts to New Jersey would not be an obstacle to frequent visitation); *Vertrees* v. *Vertrees*, 24 Mass. App. Ct. 918, 920 (1987) (visitation schedule would allow the children "to maintain an appropriate and ongoing relationship with their father"); *Rosenthal*, 51 Mass. App. Ct. at 271 (proposed visitation schedule between the father in Massachusetts and the mother in Rhode Island would not substantially change the nature of the father's contact with the child).

e. *Balancing of interests*. We discern no error in the probate judge's balancing of the relevant factors in determining the child's best interests. Such judgments involve classic discretionary decision-making by the trial judge. See *Yannas*, 395 Mass. at 712. Cf. *Adoption of Hugo*, 428 Mass. 219, 225 (1998), quoting from *Adoption of a Minor (No. 2)*, 367 Mass. 684, 688 (1975) (determination of the "best interests of a child" is a "classic example of a discretionary decision" where "much must be left to the trial judge's experience and judgment"). Here, the move would have clear and significant negative effects on the child. These effects, as the court in *Yannas*, *supra* at 711, emphasized, are "most important." For the father, a caring and involved noncustodial parent, the removal would significantly and negatively affect his relationship with his son, and for the mother, there would be significant new burdens. The primary interest being served by the move is the husband's desire to live in California.[8] The collective balancing of interests here is unlike cases where removal was found to be appropriate. Contrast *Williams* v. *Pitney*, 409 Mass. at 456 (removal allowed where the mother "would be close to friends and relatives who

---

[8]The judge evaluated the new husband's reasons for the move. Before he acquired a ranch house in a beach community 160 miles from his elderly parents' primary residence, Salwasser had not resided in California for over three decades. His putative reason for the move was to be closer to his aging parents, but his new home was miles away from them. While the stepfather did procure part-time employment prior to the end of trial, the record reflects that this employment was not a factor in his decision to relocate. The probate judge was legitimately "left with the impression that the decision to move to California was largely . . . Salwasser's and was based on his *desire* to live in California" (emphasis original).

would provide emotional support after the move, and . . . the mother would be better able to secure employment"); *Signorelli v. Albano*, 21 Mass. App. Ct. at 941 (judge failed to take into account that the mother's "husband, with whom she has just had a baby, lives in New Jersey" and had secured employment there); *Vertrees v. Vertrees*, 24 Mass. App. Ct. at 920 (removal allowed where the "detrimental effect of being apart from [the children's] father would be outbalanced by the strengthening of the custodial home in the community of the wife's supportive relatives" and where the wife also had increased opportunities for career advancement); *Rosenthal*, 51 Mass. App. Ct. at 271 (removal allowed where the financial situation was greatly improved and where relocation eliminated the mother's long commute to work, permitted her to live with her new husband, and did not deprive the father of "ongoing and meaningful contact appropriate to the circumstances").

We are satisfied that the probate judge reached his conclusion based on a fair balancing of the *Yannas* factors. We discern no abuse of discretion or error of law in his decision to deny the mother's request to remove the child to California. *Yannas*, 395 Mass. at 712. "In light of the evidence, the judge could properly find that such removal was not in the best interests of the child[], and, therefore, that cause had not been shown as required by [G. L.] c. 208, § 30." *Rubin* v. *Rubin*, 370 Mass. 857, 857 (1976).

*Judgment affirmed.*