White *v.* White.

WILLIAM WHITE *vs.* WILMA WHITE.

No. 95-P-1.

Norfolk. December 4, 1995. - March 12, 1996.

Present: BROWN, SMITH, & JACOBS, JJ.

*Divorce and Separation,* Child custody. *Parent and Child,* Custody. *Evidence,* Child custody proceeding, Credibility of witness, Opinion. *Minor,* Custody, Visitation rights. *Due Process of Law,* Child custody proceeding. *Witness,* Limits on testimony, Credibility.

A Probate Court judge, in the circumstances of a custody hearing in a divorce action, erred in taking testimony with respect to the credibility of statements and witnesses from the adult daughter of the parties in a private session where neither party nor their counsel were present [141-142]; further, substantial injustice resulted where the testimony contained inadmissible prejudicial evidence that clearly influenced the judge in denying the father custody and visitation rights with his minor daughter: the matter was remanded for a new trial before a different judge on the issues of custody and visitation [142-143]. BROWN, J., concurring.

COMPLAINT for divorce filed in the Norfolk Division of the Probate and Family Court Department on July 10, 1990.

The case was heard by *Christina L. Harms,* J.

*Margaret A. Burnham* for William White.

SMITH, J. On July 10, 1990, the appellee (mother) filed a complaint for divorce, and among other things, sought custody of the parties' minor child, Margaret, then age four.[1] On November 14, the appellant (father) filed an answer and counterclaim also seeking custody of the minor child.

The father and mother have been married to each other twice and have two daughters. Rebecca, who was twenty years of age at the time the divorce actions were filed, was born during their first marriage and Margaret was born during their second marriage.

---

[1] The parties and their children's names are pseudonyms.

Custody of Margaret was the principal contested issue during the course of the five-day trial. Interwoven with that issue was Margaret's allegation that her father had sexually assaulted her over a period of time. The judge concluded that such sexual abuse had taken place. The judge granted a divorce on the mother's complaint, awarded legal and physical custody of Margaret to the mother, and denied the father any visitation rights with Margaret until further order of the court.

On appeal, the father claims that the judge committed reversible error when, on the question of custody of Margaret and visitation by the father, she allowed Rebecca, the older daughter, to testify outside the presence of the parties and their attorneys and without cross-examination. Such testimony, according to the father, included inadmissible testimony that was highly prejudicial and influenced the judge's decision. Therefore, the father argues that the judge's findings as to the sexual abuse of Margaret by the father must be set aside, the judge's order denying the father custodial and visitation rights must be vacated, and a new trial must be held as to those issues.

The father did not object to the judge permitting the witness to testify in private.[2] "Ordinarily, a party is not entitled to present an argument on appeal on an issue not presented in the court below." *Atlas Tack Corp.* v. *DiMasi*, 37 Mass. App. Ct. 66, 70 (1994). "However, '[t]here may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court . . . below . . . . Rules of practice and procedure are devised to promote the ends of justice, not to defeat them.' " *Cruz* v. *Commissioner of Pub. Welfare*, 395 Mass. 107, 111 (1985), quoting from *Hormel* v. *Helvering*, 312 U.S. 552, 557 (1941). See also *Albert* v. *Municipal Court of the City of Boston*, 388 Mass. 491,

---

[2]In her brief and argument before the panel, the father's counsel stated that she did not object to the procedure because an objection might have antagonized the judge or the witness or both.

That explanation is weak, considering that counsel's previous objections had been handled by the judge in a temperate manner. Further, it is obvious from Rebecca's testimony, up to the point where she asked for a private session, that she was already "antagonistic" toward her father and his counsel.

494 (1983). Because we think that the judge's decisions on custody and visitation rights were based, in large part, on the testimony she received in the private session, justice weighs in favor of our considering the issue, although it was raised for the first time on appeal. Therefore, because there was no objection "we must determine whether there was any error and, if any, whether such error requires us to conclude that the [decree] is 'inconsistent with substantial justice.' " *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 9 (1983). Because of the higher standard of review, we quote liberally from the transcript of both the open and private sessions as we examine the issue.

Prior to trial, Dr. Cade, who is a psychologist and attorney, was appointed guardian ad litem for Margaret and instructed by the court "to investigate custody, visitation and all allegations [of sexual abuse]." During the course of her investigation, Dr. Cade talked to Rebecca. At trial, Dr. Cade testified that Rebecca was experiencing "a great deal of conflict at this point in time." Dr. Cade testified that, in her most recent conversation with Rebecca, Rebecca "indicated some concerns that she had because of her own experiences with her father. [Rebecca] indicated that she is currently undergoing therapy, primarily to deal with those issues. Not only does the current divorce in its context provide her with some conflict . . . she feels under pressure in terms of being caught in the middle. She is also experiencing some memories of the past that she had not before her therapy dealt with that caused her concern about her sister's safety and what has been going on." Dr. Cade testified that Rebecca did not tell her of any specific memories of her father sexually abusing her. Rebecca did state to Dr. Cade that, when she was a youngster, she traveled at times with her father, and when they stayed in a hotel, she was not allowed to sleep in a separate bed but had to sleep in the same bed with him. Rebecca also told Dr. Cade that she remembered that her father, at times, touched her on the leg and made her feel uncomfortable. Dr. Cade testified that Rebecca told her that she had "large lapses in her memory before the age of 11 which she is beginning to associate with bad memories with regard to her father. And by her own terminology, she is beginning to experience flashbacks, which she did not go into detail with."

The father issued a subpoena to Rebecca to have her testify.

The mother filed a motion to quash the subpoena. The motion recited that Rebecca is twenty-two years old, currently resides with her mother, and is "currently in therapy and is somewhat emotionally fragile." The motion also stated that "Rebecca is scheduled to start Harvard Law School in September but cannot enroll until her father pays $6,000 in outstanding tuition to her undergraduate school. Should Rebecca testify in a manner that does not please her father, she risks her entire future."

At the hearing on the motion, mother's counsel reiterated the grounds stated in her motion. Mother's counsel also stated that the father's counsel "has called [Rebecca] several times. She has not spoken to her about any substantive issues. Her father certainly, I would believe, has no idea what she would testify to, and, frankly if she has the ability — and I don't know that she has — but if she has the ability to emotionally stand up to this situation, I don't believe her testimony would be favorable to her father."

The judge denied the motion. She stated, among other things, that she was "sensitive to some of the issues that [mother's counsel] raise[d], and what I guess I'm suggesting is that I be [*sic*] prepared to rule on a question-by-question basis what everybody is going to or is not going to be permitted to ask Rebecca. I am also going to see how I think she's doing. I will not participate in anything that I think looks like torturing a witness, but I'm just saying that so everybody knows I will take it question by question, and I'm going to be alert as to how I think Rebecca is doing . . . ."

Rebecca took the witness stand and was questioned by counsel for the father. After being questioned at some length (twenty-three pages of transcript), she was asked, "Did you tell Dr. Cade certain things about your relationship with your dad?" Rebecca responded, "Yes, I did, but I don't want to discuss them; and she said I didn't have to because she was a therapist, and that was something I didn't have to discuss." Father's counsel repeated the question in regard to Rebecca's conversation with Dr. Cade. Rebecca responded, "I don't want to share that with you. There were certain things I told her it was okay to discuss, and there were other things I didn't want her to discuss; but she mentioned some of the things I said it was okay for her to discuss, and you can bring those things up."

At that point the judge said to Rebecca, "I think that at

this point it is okay for me to tell you what Dr. Cade said about you." The judge then proceeded to sum up Dr. Cade's testimony as it related to her conversations with Rebecca. The judge told Rebecca that Dr. Cade testified, among other things, that Rebecca was "distressed and didn't want to testify, and that, for example [Rebecca] had started having . . . 'flashbacks,' . . ." Rebecca responded that she agreed with Dr. Cade's testimony that she is "very distressed" and "didn't want to testify" and "was very upset." The judge told Rebecca that she was "a little concerned when somebody uses a word like 'flashback,' that you may be in a position to tell me things that no one else is in a position to tell me, or maybe I'm overreacting." Rebecca then said, "Do I have to have this conversation in front of, like, all these people?' . . . I just don't understand." The judge told Rebecca, "There is the option to talk to me in private with a tape recorder on . . . . Another option is for you to simply decide that you don't want to tell me these things and I probably will respect your wishes. You just need to know that I have to decide the case on the other evidence that's in front of me." Rebecca told the judge, "I don't like sitting here in front of my mother and father in the middle of this divorce. I don't like sitting here, being questioned by these attorneys. I don't like it. I don't feel that it's fair. I don't like it at all. I'm sick of this . . . ." Rebecca told the judge that she would "feel much more comfortable if I could talk to you in private than people shooting questions at me, either one."

The judge then said, "I'll excuse everybody. The lawyers may take legal pads with them. They may write down either the substance or the actual form of the question they would like me to ask. I will consider whether I will ask [Rebecca] those questions on those subject matters. . . ."[3] The parties and the attorneys left the courtroom. The only persons that

---

[3]It is undisputed that Rebecca was seeing a therapist for some mental or emotional problem. However, there is nothing in the record, such as a letter from her therapist, stating that Rebecca's mental or emotional state would be harmed if she testified as a witness. Further, there is nothing in the record to show that she became distraught while testifying *as a result of her mental or emotional* state. Rather, the record shows that she told the judge, as we recite in the text of the opinion, that she "didn't like" testifying in front of her mother and father and "didn't like" being questioned by the lawyers.

Rebecca's comments and the judge's mistaken view that Rebecca had "an option" to talk to the judge in private were, in our view, the reasons the judge decided to hold a private session.

remained were Rebecca, her friend Ray, the court officer, the stenographer and the judge.

After the parties and the lawyers left the courtroom, Rebecca said to the judge, "Well, I can say whatever I want right now?" The judge answered, "Yes." Rebecca then told the judge, among other things, "As far as the allegations about my sister, she told me herself when I came home from school that inappropriate things had happened between her and my father. And she just told me that, and I believe her; and she wasn't, like, coached by anyone or anything. I mean she told me herself."

Rebecca then proceeded to engage in a narrative that spanned some seven pages of transcript. She said, among other things, that she has always been close to her mother; she loves both of her parents; she loves her father dearly but that it is very hard to "deal" with him; she had nightmares until she heard about the things with her sister, then she stopped having nightmares, but was really depressed; she first went to a therapist in the spring of her freshman year in college; the therapist thought that Rebecca was depressed "about something else."

The judge then inquired of Rebecca as to what Margaret told her about the father's behavior toward her. Rebecca responded that Margaret told her that the father had kissed her "in places that he shouldn't have." The judge then said to Rebecca, " . . . one thing you said to me is that it left you with a believable feeling? You know your sister?" Rebecca responded, "Oh yes, it was true; and I never doubted it, yeah. It was definitely true. She's telling the truth."

The judge asked Rebecca, "Whatever you know and whatever you remember and whatever you think, do you think I should let your father see [Margaret] unsupervised for a weekend, for example, or for a week or for summer vacation?" Rebecca responded and said, among other things, "I don't think that would be the best thing now . . . ."

Rebecca then said to the judge, "I have a question. You were saying — like, what exactly would be helpful for you to know? You're saying that nothing I've said has helped you at all. What would be helpful?"

The judge responded, "Nothing you said before we took this break. Some of what you told me in here is helpful. I don't want you to think that anything you've said is going to

dispose of this case because it isn't; but what would be help-
ful, because I do want to be candid with you, I'm having a lot
of trouble deciding whether your father was sexually inap-
propriate with [Margaret] and even if he was, what I should
do about that, because a lot of what you told me, I think I've
already decided is true. I think your father loves you and
[Margaret] in some ways. I think he falls short in being a
good parent in some other ways. And what the court usually
tries to do is not to jerk him out of her life completely and
say, 'You are never going to see her again.' So I'm struggling
with where to go short of that, unless I have to do that. And
so what would help me, I guess, would be for me to
understand from you two things: There's his sexual behavior
toward the two of you, and there's his other behavior toward
the two of you. The other behavior in terms of being insensi-
tive, thoughtless, overbearing, selfish, all those things, I'm
finding somewhat easier to deal with than the sexual parts."
Rebecca then said, "Okay. Why don't you read those ques-
tions. I'm going to walk around for a second."

The judge then proceeded to read to herself the questions
that the lawyers for both parties had submitted to her as a
result of her invitation to do so when she ordered them to
leave the courtroom. The judge then told Rebecca, "I'm not
going to ask you any of the questions that the lawyers have
asked me to ask you, so the heck with them."

The judge then said to Rebecca, "The only other question I
have for you, I guess, is this, because the hardest part of the
case for me is whether your father was sexually inappropriate
with [Margaret]; and I have to decide whether I should give
him supervised contact or whether I should give him
unsupervised contact or whether I should give him no
contact." The judge then said to Rebecca, "I think it would
probably help me decide the case if you said to me, 'Judge,
I'm having disturbing memories and flashbacks, and some of
them have sexual content. I'm having something — I'm hav-
ing memories of my father being sexually inappropriate with
me,' because I'll be candid with you. I would probably as-
sume that he's doing it to [Margaret] too."

The judge then said, "It would probably relieve me of that
struggle if you said, 'I'm having flashbacks, and they're
depressing, but they're not clear enough. I'm not sure of
them,' or 'They're clear, but they had to do with emotional

abuse, not sexual abuse.' That would probably cool the issue a little bit for me, but I really don't want to pressure you to tell me things that you're not comfortable with telling me; and I'm frankly not going to call your therapist, because I think that's an invasion of your therapy. You tell me as much as you want to tell me."

A discussion between the judge and Rebecca followed regarding the meaning of "sexual." The judge explained that "sexual" did not mean sexual intercourse but that "[f]rench kissing can be sex. Saying dirty things can be sex, in my mind." Rebecca responded, "I'm sure that there was, like, sexually inappropriate —." The judge interrupted and said, "With you and your dad?" Rebecca responded, "Yes." The judge then asked, "And those are some of the problems that are now surfacing for you?" Rebecca answered, "Yes, but I'm not saying rape." The judge and Rebecca then engaged in a conversation about Rebecca's therapist and whether the judge should call Rebecca's therapist, "to let her or him . . . know how today went."

Rebecca then inquired of the judge if she could give her opinion. The judge said, "Yes, you may." Rebecca then said, among other things, "My mother has been very honest throughout. Obviously, she's been very honest throughout this entire case, and very forthright, and I really feel like my father has not been." Rebecca then told the judge that her father saying that "he has no money, he's broke, is not true . . . ." Rebecca also stated (three times) that her mother had "just been an exemplary person throughout this." The judge then stated, "Okay. Thank you for coming in. Would it make you feel better that you're not going to be a make-or-break witness in this case?"

Rebecca was excused. The judge then told the lawyers that she looked over the questions that they submitted but "elected to ask [Rebecca] my questions my own way, and so I asked her some of the substance of what is in both of your questions, but I elected to ask her directly none of the questions that either of you posed to me."

The judge then gave a summary of the topics she covered with Rebecca. The judge told the lawyers, "So I will also say

that, as you might have expected, the topics that we went into were the topics that you heard me explore with you before you left the room, which were such topics as her perception of her father's overall parenting skills, her use of the word 'flashbacks' with Miss Cade, her observations of both of her parents in terms of their overall parenting skills during her childhood. I think those would be a fair summary of the topics that I covered . . . ."[4]

In her memorandum of decision which contained her findings of fact, the judge stated, among other things, that Rebecca's testimony in regard to the father's "inappropriate" behavior toward her "was poignant, sincere, and utterly credible, and it lends credibility to [Margaret's] statements." The judge concluded, "Testimony and evidence at trial convince me that the [father] has been a perpetrator of sexual abuse to his younger (age 7) child [Margaret] . . . . Testimony by the older daughter [Rebecca] (age 22), while not dispositive, tended to support the allegations of sexual abuse."

We recognize that there are decisions by the Supreme Judicial Court and this court that permit Probate Court judges in some situations to interview children in private without the parties or attorneys present.

In *Dumain* v. *Gwynne*, 10 Allen 270, 271-276 (1865), the parents brought a habeas corpus petition to recover their children who had been voluntarily given to a charitable institution by the mother. The institution, in turn, had given them to a family. The institution refused to produce the children for the parents or tell them where they were but told the court that the children were being well treated and that the children had become attached to the family that was taking care of them. The court ruled that because "the liberty and welfare of the children are involved, the judge who hears the case ought to satisfy himself whether the children are improperly restrained, and whether their comfort and education are properly attended to. He is not restricted to the ordinary modes of trial, but may direct that the children be brought before him, and may examine them privately, and

---

[4]The judge's summary of the topics that her questions to Rebecca covered was incomplete. Nowhere in her summation did the judge mention that she questioned Rebecca about the father's alleged sexual abuse of Margaret or the father's alleged sexual abuse of Rebecca or that she allowed Rebecca to give her opinion about the truthfulness of Margaret's statement.

may also avail himself of affidavits or other reasonable and proper sources of evidence." *Id.* at 275.

In *Adoption of Arthur*, 34 Mass. App. Ct. 914, 915 (1993), we held that a judge did not commit error in considering a petition to dispense with the consent of Arthur's parents to his adoption, where the judge gave weight to the fourteen year old boy's preference for adoption, which occurred in a private session, in the presence of the child's counsel, but not in the presence of his parents or their lawyer.

This limited exception is available to Probate Court judges "[b]ecause of the delicacy of cases involving interests of children which may be adverse to that of their parents." *Id.* at 915. But that exception does not apply here. Rebecca was not a child. She was a twenty-two year old college graduate. There was no issue before the judge concerning Rebecca's custody. Further, several of the questions asked by the judge were an attempt on her part to resolve conflicting testimony and to ascertain the credibility of statements and witnesses, areas that should not be covered in private sessions, even where those sessions are permitted.[5]

We are not aware of any court decision or rule that permits a Probate Court judge, in these circumstances, to allow a witness to testify in private.

We recognize that the private session did not violate the constitutional right to confront witnesses (see art. 12 of the Declaration of Rights of the Massachusetts Constitution) because this is a civil matter. *Commonwealth* v. *McGruder*, 348 Mass. 712, 716 (1965). *Frizado* v. *Frizado*, 420 Mass. 592, 596-597 n.3 (1995) ("Because a G. L. c. 209A proceeding is a civil, and not a criminal, proceeding, the constitutional right to confront witnesses and to cross-examine them set forth in art. 12 of the Declaration of Rights has no application in this case"). *Adoption of Arthur*, 34 Mass. App. Ct. at 915 (No "violation of the father's rights under the confrontation clause . . . because the proceedings were civil in nature"). However, in *Adoption of Mary*, 414 Mass. 705, 710 (1993), the court stated that, "Due process concerns and fundamental

---

[5]We are also aware of Mass.R.Dom.Rel.P. 43(a) (1975) which states, in relevant part, "In all trials the testimony of witnesses shall be taken orally in open court, *or such other place as the judge may in his [or her] discretion determine* . . . ." (emphasis added). We do not read the rule to permit the procedure employed by the judge in this matter.

fairness require that a parent have an opportunity effectively to rebut adverse allegations concerning child-rearing capabilities, especially in a proceeding that can terminate all legal parental rights." See also *Duro* v. *Duro*, 392 Mass. 574, 580 (1984) (judgment awarding custody of two minor children was reversed because judge had received private oral reports from a probation officer, and parent had no opportunity to cross-examine probation officer).[6] Any opportunity to rebut such testimony is lost when the judge allows a witness to testify in a private session, such as occurred here.

Although we commend the judge for her sensitivity to Rebecca's concerns, the judge committed error in allowing Rebecca to testify in private session. Further, substantial injustice resulted from that error. Here, Rebecca's testimony, given in private, resulting from questions from the judge or given voluntarily by the witness, contained inadmissible, prejudicial evidence which clearly influenced the judge in denying the father custody and visitation rights.

Some of the inadmissible evidence included the following.

· (1) The judge allowed Rebecca to express her opinion about the credibility of Margaret ("she's telling the truth"); about the credibility of her mother ("she's been very honest throughout this entire case, and very forthright"); and about the credibility of her father ("I really feel like my father has not been [honest]"). A witness should not be allowed "to comment on the credibility of another witness." Liacos, Massachusetts Evidence § 6.5 (6th ed. 1994).

(2) The judge allowed Rebecca to give her opinion on whether the judge should allow the father visitation rights with Margaret and under what conditions. This is improper. There is nothing in the record demonstrating that Rebecca is an expert, qualified to give an opinion on such a delicate matter.

(3) The judge allowed Rebecca to relate experiences of sexual abuse allegedly perpetrated on her by her father when she was a child. In open court, perhaps this testimony might

---

[6]Rebecca was called by her father to testify; therefore, she was his witness and not subject to cross-examination. However, her testimony in the private session was adverse to him on the questions of custody and visitation, and if given in open court, the father could have asked the judge to declare her to be an "unwilling or hostile witness" and subjected her to "leading questions." Mass.R.Dom.Rel.P. 43(b) (1975).

have been admissible, but in a setting of a private session with the judge, it was clearly inadmissible.

(4) Several of the judge's questions would not have been permitted, over objection, if asked by a lawyer. The judge, by her questions, informed Rebecca what was "bothering" her [the judge] and what testimony would be "helpful." This kind of question, especially by a fact-finder, is clearly improper.

It is clear that the judge's findings on custody and visitation rights were tainted by the private session. She stated that she found Rebecca's testimony about her father's inappropriate behavior "poignant, sincere, and utterly credible, and it lends credibility to [Margaret's] statements." Further, it is obvious from the judge's questions to Rebecca during the private session (the "troubling" and "helpful" comments recited above) that the judge had not made any decision at that time in regard to custody or visitation and wanted Rebecca's testimony on those matters.

The error of holding the private session was so substantial that it warrants a new trial on the issues of custody and visitation.

Therefore, those portions of the divorce judgment relating to custody and visitation are vacated, and the matter is remanded to the Probate Court for a new trial on the issues of custody and visitation. The trial should be held before a different judge.

*So ordered.*

BROWN, J. (concurring). I am fully in accord with the reasoning and result reached by the majority. As the majority opinion notes, it is hornbook law that a witness should not be permitted to comment on the credibility of another witness, or of any party to the proceeding. I am deeply disturbed that it was the judge herself who solicited such improper testimony in this case. I would reverse and remand on that point alone.