Rosalee A. Abbott[1] vs. Michael A. Virusso, Jr.

No. 05-P-1612.

Middlesex. September 19, 2006. - February 28, 2007.

Present: Duffly, Smith, & Kantrowitz, JJ.

Further appellate review granted, 449 Mass. 1101 (2007).

*Divorce and Separation,* Modification of judgment, Child custody. *Minor,* Custody. *Parent and Child,* Custody of minor. *Probate Court,* Divorce, Custody of child. *Practice, Civil,* In camera review.

In an action for modification of a divorce judgment, seeking authority for the plaintiff to relocate to Arizona with her son, for whom she was the primary custodial parent, the probate judge's view that the child's best interests should be the "sole focus" may have influenced his ultimate determination, despite having made findings that established that the plaintiff had a good, sincere reason to move, and therefore, this court vacated the judgment denying the modification, where the judge's findings focused primarily on the negative effects of the move upon the son's relationship with his father and his sister, and where it was not apparent from the judge's conclusions regarding the son's best interests that the judge included within the best interests calculation appropriate consideration of the quality of life of the custodial parent. [328-334] Kantrowitz, J., dissenting.

In an action for modification of a divorce judgment, seeking authority for the plaintiff to relocate to Arizona with her son, the judge erred in conducting an unrecorded in camera interview of the son and his sister without the guardian ad litem present. [334-339]

Complaint for divorce filed in the Middlesex Division of the Probate and Family Court Department on March 20, 2002.

A complaint for modification of judgment was heard by *Edward J. Rockett,* J., and questions of law were reported by him.

*Thomas Paul Gorman* for the plaintiff.

*India L. Minchoff* (*Stephen J. Kuzma* with her) for the defendant.

[1] Also known as Rosalee A. Virusso.

DUFFLY, J. A judge of the Probate and Family Court denied Rosalee Abbott's request, set forth in a complaint for modification of a divorce judgment, that she be allowed to relocate with her son and fiancé from Newton to Tucson, Arizona. The judge's findings do not reflect whether he gave "continued consideration of the quality of life of the custodial parent," *Pizzino* v. *Miller*, 67 Mass. App. Ct. 865, 875 (2006), in deciding as he did. In addition, certain findings appear to rely on statements of the child, then eleven years old, made in an unrecorded, in camera interview with the judge to which the mother objected. We therefore vacate the judgment and remand for further proceedings.[2]

*Background facts and proceedings.* The parties married in 1988 and have two children: a daughter, born October 31, 1989, and a son, born October 23, 1993. Following a "hotly contested trial," the parties were divorced in December, 2003. The divorce judgment provides that the parties were to "share physical custody of their children" in accordance with a court-imposed parenting schedule, pursuant to which the children were to reside primarily with the mother.[3] The judgment and parenting schedule entered even though the divorce judge (not the same judge who heard the complaint for modification) was aware that at the time of trial the daughter was, in fact, living with the father in Newton. As the divorce judge found, this came about because of the father's anger with the mother, who was having an affair, which "caused him to seek an ex parte order for custody of [the daughter], removing the child from the marital home and separating her from her brother." The mother was found to have been "the primary homemaker and child rearing parent" during the marriage.

Since the divorce, the son has continued to reside primarily with the mother who, as found by the judge who presided over the modification action, is the son's "primary care parent," whereas the daughter continues to live with the father. The son

---

[2]The trial judge having retired, the matter must be reassigned to a new judge for further hearing.

[3]In general, the children were to stay overnight with the father on Tuesdays, returning to school the next day, and alternating weekends from Friday until the next school day. On Jewish high holidays they were to remain with the mother; other holidays and vacations were to be shared.

visits with the father in accordance with the parenting schedule set forth in the divorce judgment. The mother has become engaged to marry James Seder, and as of September, 2004, they have resided together with the son in the former marital home.[4] The father denied the mother's request to relocate with the son to Arizona, where her fiancé plans to move,[5] and on August 25, 2004, the mother filed a complaint seeking authority to remove. The father filed a counterclaim for modification seeking physical custody of both children and an award of child support from the mother. After a three-day trial beginning on July 11, 2005, the judge dismissed the mother's complaint; denied the father's complaint as to physical custody of the son; amended the divorce judgment by awarding physical custody of the daughter to the father; and reduced the father's child support obligation from $400 to $200 per week. The trial judge's findings and conclusions of law supporting denial of the mother's request are set forth in an amended memorandum of decision[6] dated September 13, 2005.[7]

*Discussion.* Neither party maintains that the facts of the

[4]Under the divorce judgment, the mother must sell the marital home and divide the proceeds with the father on the date of her remarriage (or other contingencies that are not relevant here).

[5]The parties do not dispute the uncontroverted record evidence indicating that Seder was a practicing physician specializing in anesthesiology until he became disabled in 1994; he now receives payments under two policies of disability insurance. His family members reside in Tucson, Arizona (a migration that began in 2000); he has purchased a home in Tucson (title to which he shares with the mother), where he plans to live, and to attend the integrative medicine program at the University of Arizona. ·

[6]The memorandum also contains, in a section entitled "Background", distillations of the testimony of some witnesses, generally prefaced with "The defendant testified," or "The plaintiff testified." A statement of the evidence "of course is not a finding." *Pizzino* v. *Miller*, 67 Mass. App. Ct. 865, 868 n.7 (2006). We have, therefore, not included within our recitation of the findings such descriptions as, for example, the judge's extensive description of the testimony of the guardian ad litem (GAL), (including that "the relationship between [the son] and [the daughter] was not close" and it could "improve or be beneficial to them if the son moved to Arizona," and that the relationship between the son and his father would not change as a result of a move). The judge does not state that he credited the testimony summarized in this section.

[7]The following month, the trial judge reported questions that, in essence, inquire whether the "standard for removal set forth in *Yannas* [v. *Frondistou-Yannas*, 395 Mass. 704 (1985),]" contains "inherent discrimination against the noncustodial parent," and whether in camera interviews of "children twelve

present case are governed by *Mason* v. *Coleman*, 447 Mass. 177, 178 (2006), where the parties had "joint physical and legal custody"[8] of their children. During the marriage in the *Mason* decision, "each parent took the part of a 'primary caretaker,'" and the "parents divided physical custody of the children approximately equally" after the divorce judgment entered. *Id.* at 178-179. The *Mason* case is relevant to circumstances where "neither parent has been exercising a clear majority of custodial responsibility." *Id.* at 185, quoting from the American Law Institute's (ALI) Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.17(1), (4)(c) (2002) (Principles of the Law of Family Dissolution).[9] In such a case, "the 'best interest' calculus pertaining to removal is appreciably

years of age and older [are proper or necessary] to determine their preferences as to who they wish to live with and why," where a GAL has been appointed. As the judge forthrightly noted in the report, "the matter reported does not come strictly within the purview of [G. L. c.] 215, § 13, (a determination having been made)." As neither G. L. c. 215, § 13, nor Mass.R.Civ.P. 64, as amended, 423 Mass. 1410 (1996), "authorizes a judge to report a case that has been finally decided in the trial court," *Riley* v. *Riley*, 434 Mass. 1021, 1022 n.5 (2001), the report must be discharged. Moreover, the parties address only the issues raised by the mother's appeal. We do not reach reported questions not argued or briefed by the parties. See *Roberts* v. *Enterprise Rent-A-Car Co. of Boston*, 438 Mass. 187, 188 n.4 (2002).

[8]As the instant case makes clear, custody judgments issued by the Commonwealth's courts do not consistently utilize these terms as defined in G. L. c. 208, § 31. See, e.g., *Custody of Kali*, 439 Mass. 834, 834 (2003) ("Probate and Family Court awarded sole legal and primary physical custody to her father"); *Belfar* v. *Lipsett*, 439 Mass. 1016, 1016 (2003) (judgment that parties "share joint custody of their son"); *Thompson* v. *Thompson*, 11 Mass. App. Ct. 911 (1981) (parents awarded joint legal custody of children; judge designated wife "primary care parent"); *Rolde* v. *Rolde*, 12 Mass. App. Ct. 398, 405-406 (1981) ("joint custody" not appropriate where wife had been "primary nurturing parent" and "primary caretaker"); *O'Connell* v. *Greenwood*, 59 Mass. App. Ct. 147, 148 (2003) (mother awarded "physical custody," both parents "awarded shared legal custody"); *Cooper* v. *Cooper*, 62 Mass. App. Ct. 130, 131 (2004) (wife awarded "primary physical custody of the children"); *Austin* v. *Austin*, 62 Mass. App. Ct. 719, 722 (2004), *S.C.*, 445 Mass. 601 (2005) (judgment awards parties "joint legal and shared physical custody of the minor child"; child shall reside primarily with mother during school year).

[9]Terms such as legal and physical custody are eschewed by the ALI, which instead utilizes terminology descriptive of the various, discrete parenting responsibilities and functions, "recogniz[ing] that different types of involvement in the child's life are relevant in different ways to the various allocation

different," *Mason* v. *Coleman, supra* at 184, from those in which a primary custodial parent seeks removal, as here.

In cases such as the one before us, the "real advantage" test applies. See *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704, 705, 706, 711 (1985) (parents had "joint legal custody," but mother had "physical custody"). Cf. Principles of the Law of Family Dissolution, *supra* at § 2.17(4)(a) ("The court should allow a parent who has been exercising the clear majority of custodial responsibility to relocate with the child if that parent shows that the relocation is for a valid purpose, in good faith, and to a location that is reasonable in light of the purpose"). Under the real advantage test, "[s]hould it be found that there is a genuine, recognizable advantage to the custodial parent from the move, the inquiry then turns to whether the move is consistent with the children's best interests. It is important to emphasize that consideration of the advantages to the custodial parent does not

---

issues addressed by the Chapter." Principles of the Law of Family Dissolution, *supra* at § 2.03 comment g.

"Custodial responsibility" is defined as "physical custodianship and supervision of a child." *Id.* at § 2.03(3). "Decisionmaking responsibility refers to authority for making significant life decisions on behalf of the child." *Id.* at § 2.03(4). "Caretaking functions" are described as "tasks that involve interaction with the child or that direct, arrange, and supervise the interaction and care provided by others." Id. at § 2.03(5) (listing numerous tasks as exemplifying caretaking function). "Parenting functions" are described as "tasks that serve the needs of the child or the child's residential family," and include caretaking functions, in addition to provision of support, among other enumerated tasks.

Comment g to this section states, in part:

"Caretaking functions are the subset of parenting functions that involve the direct delivery of day-to-day care and supervision to the child. These functions include physical supervision, feeding, grooming, discipline, transportation, direction of the child's intellectual and emotional development, and arrangement of the child's peer activities, medical care, and education. . . . Because caretaking functions involve tasks relating directly to a child's care and upbringing, it is assumed that they are likely to have a special bearing on the strength and quality of the adult's relationship with the child. For this reason, the Chapter [setting forth principles governing allocation of custodial and decision-making responsibility for minor] makes each parent's share of past caretaking functions central to the allocation of custodial responsibility at divorce."

disappear, but instead remains a significant factor in the equation." *Pizzino* v. *Miller*, 67 Mass. App. Ct. at 870.

a. *Good, sincere reason to move.* "[T]he first consideration [in the process of determining the best interests of a child] is whether there is a good reason for the move, a 'real advantage.' " *Yannas* v. *Frondistou-Yannas, supra* at 711. This requires that the custodial parent establish "a good, sincere reason for wanting to remove to another jurisdiction." *Ibid.* The judge must consider both "the soundness of the reason for moving, and the presence or absence of a motive to deprive the noncustodial parent of reasonable visitation." *Ibid.* See *Rosenthal* v. *Maney*, 51 Mass. App. Ct. 257, 267 (2001).

Here, the judge found that "if [the mother] marries Dr. Seder, [she] will have more economic security than she presently has,"[10] and that "the [mother] would benefit emotionally and socially if she moved to Arizona because she wishes to reside with her fianc[é], and it would appear that she is looking for a fresh start away from her extended family." The judge did not find that the mother had any motive to deprive the father of reasonable visitation; indeed, the parties are in agreement that the father's time with the son has been consistently maintained in accordance with the court ordered schedule. The findings that the mother would "benefit emotionally and socially" from the move, as well as financially, establish that the mother had a good, sincere reason to move.[11]

Despite these findings, the trial judge concluded that the *Yannas* standard did not focus sufficiently on the child's best inter-

---

[10]The judge also found that, "if she does not marry Dr. Seder, she will have less financial security than she presently has, because she would be giving up her employment here where she earns $810 per week without securing employment in the Tucson area." There is nothing in the record to suggest that the mother will not be working in Tucson and earning at least the amount she presently earns, or that Seder and the mother will not then be married (when considerations of multiple house moves are no longer an impediment, see note 4, *supra*).

[11]Despite the findings clearly supporting the determination that the mother has established a real advantage to the move, the modification judgment, dated August 4, 2005 (which predated the findings by one month), concluded that the mother "has failed to sustain her burden that there is a 'real advantage' in removing" the son to Arizona. This conclusion is not supported by the judge's subsidiary findings, and we are not bound by it. *Balcam* v. *Hingham*, 41 Mass. App. Ct. 260, 261 (1996).

est, which he felt should be "the sole focus." This view may have influenced the judge's ultimate determination that removal would not be in the son's best interest.

b. *Collective consideration of remaining factors.* "If the custodial parent establishes a good, sincere reason for wanting to remove to another jurisdiction, none of the relevant factors becomes controlling in deciding the best interests of the child, but rather they must be considered collectively." *Yannas* v. *Frondistou-Yannas*, 395 Mass. at 711-712. *Rosenthal* v. *Maney*, 51 Mass. App. Ct. at 267-268. "[B]ecause the best interests of a child are so interwoven with the well-being of the custodial parent, the determination of the child's best interest requires that the interests of the custodial parent be taken into account." *Yannas* v. *Frondistou-Yannas*, *supra* at 710, quoting from *Cooper* v. *Cooper*, 99 N.J. 42, 54 (1984). See *Hale* v. *Hale*, 12 Mass. App. Ct. 812, 815 (1981); *Rosenthal* v. *Maney*, *supra* at 266. At this second stage, "[e]very person, parent and child, has an interest to be considered. The judicial safeguard of those interests lies in careful and clear fact-finding . . . ." *Yannas* v. *Frondistou-Yannas*, *supra* at 712.

In addition to making findings relative to the initial "real advantage" determination, the judge stated:

> "The Court finds that [the son] would not benefit from a move to Arizona as he does not wish to move to Arizona thereby being separated from the [father, his sister], his extended family and friends. If removal were granted, the Court finds that if [the son] were to visit the [father] and [his sister] on a monthly or bi-monthly basis as opposed to a daily or weekly basis, it would weaken his relationship with them.

> "The Court finds that the educational system of the Newton public schools is superior to the educational system of the Tucson public schools, hence it is beneficial for [the son] to remain in the Newton system. . . .

> "If removal were granted, the Court finds that reasonable alternative visitation would be problematic in that [the son] would be asked to perform most of the travel because [the daughter] refuses to live with Dr. Seder, and

therefore she would be living in a motel during her visits with the plaintiff. Nevertheless, reasonable alternative visitation could be worked out with [the son] traveling to Newton. . . .

"The Court further finds that it would be in the best interest of [the son] to reside with either parent. Presently, [the son] has a shared living arrangement, wherein he spends more time with the [mother]. [The son] has a close relationship with the [father] and his sister. [The son] is a happy, intelligent, well-adjusted child who wishes to continue to reside in the Newton area."

The judge concluded that "it would be detrimental to the relationship between [the son, his sister,] and the [father] to grant the [mother's] request to remove [the son] to Arizona. Moving to Arizona would adversely affect the emotional needs of [the son]. Hence, there is no reason to disturb or disrupt [the son's] life or living arrangement just so the plaintiff may move to Arizona to live with her fianc[é]. The overriding concern and issue in this case is what is in [the son's] best interest, and the Court finds it is [the son's] best interest to deny the [mother's] request to remove him to Arizona." These ultimate findings, or conclusions, do not adequately reflect consideration of each of the interests — those of the mother, as well as the father and the child — that inform the best interests determination.

Apart from the conclusory observation that "[m]oving to Arizona would adversely affect the emotional needs of [the son]," there is no subsidiary finding regarding the potential advantages or disadvantages of the move to him,[12] no mention of the mother's interests and no finding as to her relationship with the son. In contrast, the findings take particular note of the son's good relationship with his father and sister, and focus on the negative impact on this relationship of a "monthly or bi-monthly" visitation schedule (although the judge also found that "reasonable alternative visitation could be worked out with [the son] traveling to Newton"). See *Cartledge* v. *Evans*, 67

[12]The finding that the Newton schools are "superior" does not compel the conclusion that Tucson's school are not appropriate to the son's needs.

Mass. App. Ct. 577, 581 (2006) (disruption in visits with non-custodial parent "cannot be controlling or no removal petition would ever be allowed").

This is similar to what we found lacking in the findings in *Hale* v. *Hale*, 12 Mass. App. Ct. at 815 (also involving custodial arrangement in which father had custody of older child and mother had custody of younger children). What we said in the *Hale* decision applies with equal force here:

> "All of the findings and rulings concerning removal were directed to the husband's relationship with his children and the relationship between the [siblings]. The judge made no findings as to the relationship of the mother to the child[], nor did he discuss the effect on the child[] of the advantages or disadvantages of the move except as it affected [his] relation to the[] father."

*Ibid.* See *Signorelli* v. *Albano*, 21 Mass. App. Ct. 939, 940 (1985) (remand required to consider *Yannas* factors, where judge gave insufficient "weight to the quality of life of the custodial parent by reason of the separations enforced on her, on her husband, and on her other child"); *Rosenthal* v. *Maney*, 51 Mass. App. Ct. at 268, quoting from *Yannas* v. *Frondistou-Yannas*, 395 Mass. at 711 (no findings reflecting consideration of relationship of mother to child or "any improvement flowing from an improvement in the quality of the custodial parent's life").

Because the findings focus primarily on the negative effects of the move upon the son's relationship with his father and sister, and because it is not apparent from the conclusions regarding the son's best interests that the judge included within the best interests calculation appropriate "consideration of the quality of life of the custodial parent," *Pizzino* v. *Miller*, 67 Mass. App. Ct. at 875, we must vacate the judgment.

c. *Other issues.* The mother objected at trial to the judge conducting an in camera interview of the children without the guardian ad litem present.[13] That interview was not recorded

---

[13]The reservation and report, see note 7, *supra*, also raised the issue whether in camera interviews of the children are proper where a GAL had been appointed.

and the judge rejected the mother's request that the court-appointed guardian ad litem be present.[14]

Rules of the Probate and Family Court permit a judge of that court to "hear motions and other interlocutory matters in chambers or in open court." See Rule 15 of the General Rules of the Probate Court; Rule 101 of the Supplemental Rules of the Probate Court. However, "all courtroom proceedings, with certain exceptions for matters of a preliminary or administrative nature, shall be recorded electronically . . . . Motion hearings, including ex parte matters, and pretrial conferences shall also be recorded."[15] Rule 201 of the Supplemental Rules of the Probate Court. The only exception to the recording requirement is the "[u]ncontested adoption hearing[] held in the lobby." *Ibid.* Nothing in these rules exempts a judge interviewing children in camera from making an electronic record of the proceedings. See also Uniform Marriage and Divorce Act § 404(a), 9A (Part II) U.L.A. 380 (Master ed. 1998) (requiring "a record of the interview to be made and to be part of the record in the case"); Principles of the Law of Family Dissolution, *supra* at § 2.14, comment a ("The practice in most jurisdictions is to require a transcript, videotape, or other reliable means of recording the

---

[14]A probation officer was present, but apparently did not participate in the interview or make a record of it. The only "record" of the interview is the judge's summary set forth in his memorandum, reflecting that he asked the daughter "about her mother's and father's homes, school, courses taken, extracurricular activities, neighborhoods, friends, likes and dislikes, and her relationship with her mother, father, brother, Dr. Seder and extended family members. The Court asked [the son] the same or similar questions. In addition the Court asked [the son] about his trips to Arizona, and his relationship with his sister." The daughter's responses were not noted.

As to the son, the memorandum describes only three questions addressed specifically to him, and the son's responses. The judge stated "[t]he most important questions that the Court asked [the son], as well as his answers are[:] Which parent would you prefer to live with? [He] would not answer this question in that he would not commit to or prefer one parent over the other. Where would you prefer to live: in Newton, Massachusetts or Tucson, Arizona? [He] stated that he wanted to continue to live in Newton. Lastly, the Court asked [him] what his relationship with his sister was like[.] [He] described it as being tight."

[15]The requirement of electronic recording is "subject to the availability and functioning of appropriate recording devices. Said recording shall take place whether or not a court stenographer is present in the courtroom." Rule 201 of the Supplemental Rules of the Probate Court.

complete interview, which may be reviewed by the parties and becomes part of the record on appeal").

The requirement that an in camera interview be recorded is consistent with our expressed concern about due process and fundamental fairness when children are interviewed in camera. "Any opportunity to rebut [a witness's] testimony is lost when the judge allows a witness to testify in a private session, such as occurred here." *White* v. *White*, 40 Mass. App. Ct. 132, 142 (1996). Cf. *Duro* v. *Duro*, 392 Mass. 574, 581 (1984) (judgment awarding custody of two minor children was reversed because judge had received private oral reports from probation officer, and parent had no opportunity to cross-examine probation officer); *Adoption of Mary*, 414 Mass. 705, 710 (1993) ("Due process concerns and fundamental fairness require that a parent have an opportunity effectively to rebut adverse allegations concerning child-rearing capabilities, especially in a proceeding that can terminate all legal parental rights").

Here, the judge's finding that the son "would not benefit from a move to Arizona as he does not wish to move to Arizona thereby being separated from the [father, his sister], his extended family and friends," appears to have been based largely on the son's statements made during the unrecorded in camera interview with the judge.[16] As such, it figured significantly in the judge's determination of best interests. In any subsequent proceeding, if the judge conducts an in camera interview of the son, the interview must be electronically recorded and that record made available to the parties.

We are confident that the trial judge was motivated solely by a desire to obtain as much helpful information as possible in order to decide the difficult issues before him involving the son's best interests. Indeed, over one and one-half centuries

---

[16]The GAL, testifying on his interview with the son, noted that the son had indicated "he would rather stay [in Newton] but he thought if he went [to Tucson], he would be able to make friends and it would be okay. . . . He indicated quite strongly he didn't want to be away from his mother. . . . [H]e didn't express to me that he was fearful of the circumstances." In his written report to the court, the GAL stated: "[H]e liked what he saw when he went to Arizona, and [told me] that he was not worried about having any problems adjusting if and when he did move there. He seemed unconcerned about the entire matter . . . ." See note 6, *supra*.

ago, the Supreme Judicial Court determined that in cases involving "the liberty and welfare of [] children . . . , the judge who hears the case ought to satisfy himself whether the children are improperly restrained, and whether their comfort and education are properly attended to. . . . If the children [are] of suitable age, he might to some extent be influenced by their opinions and preferences." *Dumain* v. *Gwynne*, 10 Allen 270, 275 (1865).[17] It is to this case that we trace subsequent decisions citing the same exception to "the ordinary modes of trial." See, e.g., *White* v. *White*, 40 Mass. App. Ct. at 140-141 (no objection to in camera interview; limited exception not applicable to twenty-two year old child); *Ardizoni* v. *Raymond*, 40 Mass. App. Ct. 734, 735-736, 741 (1996) (parties consented to in camera interview; case remanded where judge's "articulated reasoning manifests an excessive reliance upon the preferences of two eleven year old children as to which parent each would like to live with").

There has been no decision in the last decade discussing in camera interviews of children, nor has any decision of our appellate courts considered current research as to the circumstances which contribute to or detract from the reliability of children's statements made during in camera interviews conducted by a judge.[18]

We recognized in the *Hale* decision that "the preferences of children of these ages must be treated with caution. . . . It is natural for children of nine and thirteen to prefer not to leave their school and friends." *Hale* v. *Hale*, 12 Mass. App. Ct. at 820. In addition to citing numerous cases, we referenced the

[17]Since the *Dumain* case was decided, the Legislature enacted G. L. c. 215, § 56A, St. 1923, c. 432, authorizing the court to appoint a GAL who, in the context of investigating a child's best interest, may interview the child.

[18]See, e.g., Atwood, The Child's Voice in Custody Litigation: An Empirical Survey and Suggestions for Reform, 45 Ariz. L. Rev. 629, 674-675 (2003); Jones, Judicial Questioning of Children in Custody and Visitation Proceedings, 18 Fam. L. Q. 43, 73 (1984); Rogers, Comment: Child Custody: The Judicial Interview of the Child, 47 La. L. Rev. 559, 585 (1987); Walker, Forensic Interviews of Children: The Components of Scientific Validity and Legal Admissibility, 65 L. and Contemporary Problems, 149, 162-167 (Winter 2002). See also Principles of the Law of Family Dissolution, *supra* at § 2.14 comment b, at 330 ("Some of the difficulties in obtaining information from children can be alleviated by asking indirect rather than direct questions").

work of Wallerstein & Kelly, Surviving the Breakup 314-315 (1980), in which the "authors show the defects of relying on the opinions or preferences of children of these ages." *Hale* v. *Hale, supra.* See Principles of the Law of Family Dissolution, *supra* at § 2.08 comment f (child's preference can be "unreliable, short-sighted or irrational"). On the other hand, while cautioning against reliance on the stated preferences of young children, the ALI would extend to judges the "discretion to interview the child, or direct another person to interview the child, in order to obtain information relevant to the issues of the case." *Id.* at § 2.14. That section goes on to state: "Counsel for a parent or for a child should be permitted to propose questions to the court that may be asked of the child." *Ibid.*

Some jurisdictions limit or prescribe the circumstances in which in camera interviews by judges may be conducted.[19] Although we have set forth in the margin articles and decisions discussing these issues, we do not suggest that this reflects exhaustive research of the subject or that any of the approaches proposed in these materials should be adopted in this Commonwealth. We think the issues worthy of attention, but they have not been sufficiently raised and argued in this appeal to enable us, at this time, to determine whether to impose new

[19]See, e.g., *Watermeier* v. *Watermeier*, 462 So. 2d 1272, 1275 (La. Ct. App. 1985) ("the interview must be conducted in chambers outside of the presence of the parents, but in the presence of their attorneys, with a record being made by the court reporter"); *Molloy* v. *Molloy*, 247 Mich. App. 348, 351-353 (2001) (scope of in camera interview of child is limited to inquiry into child's custodial preference, and "is not meant to be a reliable form of fact-finding"; inquiry must be made to test authenticity, motives and consistency of preference), rev'd in part, on other grounds, 466 Mich. 852, 852 (2002) (reversing section of opinion of Court of Appeals holding that in camera interviews must be recorded, and declining to conclude on basis of record that Michigan or Federal Constitution mandates recording of all in camera interviews); *Robison* v. *Lanford*, 841 So. 2d 1119, 1124-1126 (Miss. 2003) (record must be made by court reporter physically present during in-chambers interview to protect rights of parties to appellate review); *Dwyer* v. *De La Torre*, 252 A.D.2d 695, 696 (N.Y. 1998) (lower court "erred in proceeding to interview the child without the presence of the Law Guardian, who is the child's attorney"); *Willis* v. *Willis*, 149 Ohio App. 3d 50, 59 (2002) (in camera interviews of children must be transcribed, though transcripts must be sealed and available only to appellate court); and cases cited in the reporter's notes to Principles of the Law of Family Dissolution, *supra* at § 2.14, at 330-331.

rules governing the conduct of an in camera interview of minor children in custody proceedings or whether in some circumstances such interviews ought not to be conducted.

The mother also challenges the judge's focus on the son's relationship with his sister, as failing to provide a proper basis to deny removal. There is nothing in the findings to suggest that the son's relationship with his sister or other members of this extended family "are so important to [his] emotional well-being that they deserve primacy over his relationship with his mother." *Rosenthal* v. *Maney*, 51 Mass. App. Ct. at 270. On the other hand, consideration of a sibling relationship may be one of the many factors to be considered when deciding what is in a child's best interests, so long as the judge makes "specific or detailed findings based on evidence within the record, apart from the children's own statements of preference." *Ardizoni* v. *Raymond*, 40 Mass. App. Ct. at 741.

*Conclusion.* The report is discharged. We vacate the judgment and remand this matter for further hearing so that findings may be made, consistent with this opinion, as to all of the relevant interests. It is within the judge's discretion to consider evidence regarding the current circumstances of the parties and the son.

*So ordered.*

KANTROWITZ, J. (dissenting). I do not believe that the judge here abused his discretion by denying the mother's petition to remove one of her two children across the country. I further believe that the judge conducted a thorough hearing and issued a thoughtful decision,[1] taking into consideration the necessary factors in his determination of what was in the best interests of the children. I, thus, respectfully dissent.

The ultimate issue, it appears, in removal cases where the custodial parent seeks to move to be with a significant other, is the best interests of the child. See *Dickenson* v. *Cogswell*, 66

[1]The trial judge was fully aware of the pertinent statute and case law, incorporating them by name and principle in his decision.

Mass. App. Ct. 442, 449 (2006); *Pizzino* v. *Miller*, 67 Mass. App. Ct. 865, 874 (2006).[2,3]

Trial judges have been applying the best interests test for decades, and typically do so in a highly competent manner; they are well versed, as here, in the considerations that must be balanced.[4] "The trial judge is in a position far superior to our own with respect to these judgments, and absent an abuse of discretion, we do not presume to interfere." *Pizzino* v. *Miller*, 67 Mass. App. Ct. at 872.

I need not recite the legal standard that must be satisfied before we can conclude that a judge has abused his discretion. Suffice it to say that in this case, it is my belief that such a conclusion is not warranted.

In a nutshell, the judge found that the son:

a. expressed a desire to stay in Massachusetts and not move to Arizona[5];

b. was well-adjusted in his current setting;

---

[2]Both the *Dickenson* and *Pizzino* cases involved the mother of children seeking to relocate to be with her new husband. Whether a different analysis should be applied where the mother seeks to move to join her fiancé, as here, is best left for another day.

[3]The court indicates that neither party maintains that *Mason* v. *Coleman*, 447 Mass. 177 (2006), controls, each relying instead upon *Yannas* v. *Frondistou-Yannas*, 395 Mass. 704 (1985). In *Yannas*, "we addressed removal where one parent had *sole* physical custody of the children. Today we consider the appropriate standard where parents have joint physical and legal custody" (emphasis added). *Mason* v. *Coleman, supra* at 178. It would appear, thus, that the case at bar is more analogous to *Mason* than *Yannas*.

[4]In every case, some findings are more significant than others, upon which the judge is permitted to rely heavily. Here, the siblings enjoyed a close relationship, upon which removal would have a negative effect. The judge was permitted to give more weight to that determination than others. This, of course, does not mean that he was free to ignore other factors that should be considered.

[5]The majority downplays the son's preference to remain with his father and sister in the Commonwealth where he has lived his life to date. The majority indicates that the son's preference came from an interview with the judge. While that meeting may have been a source of the information, it was not the only source; the guardian ad litem (GAL) testified as to the son's preference. As we give children who have reached the age of twelve in termination cases the ultimate determination as to whether to approve adoption, see G. L. c. 210, § 2; *Adoption of Ramona*, 61 Mass. App. Ct. 260, 266 n.13 (2004), a judge is free to place whatever weight, including significant weight, on the wishes of the child, especially an older one. I recognize that the son was born on

c. had a close relationship with his sister (who is remaining in the Commonwealth[6]), which would be weakened if he were removed;

d. had a close relationship with his father, which also would be weakened if he were removed;

e. had an extensive social circle of friends and family in Newton;

f. had a strong relationship with his local extended family, including his uncles, cousins and grandparents, who played an important supportive and developmental role; and

g. was attending a superior school system.[7]

The mother had no family in Arizona,[8] although her retired fiancé, James Seder (who testified that he would move to Arizona even if the mother's request for removal were denied),[9] had family that had recently relocated there. While the mother, who had not obtained work in Arizona, asserted that she would have greater employment opportunities in Arizona as a compounding pharmacist (whereas she had only obtained work in Massachusetts as a part-time "ordinary" pharmacist), and that she would have opportunities to create a nutriceuticals business in Arizona (having failed in such an attempt in Massachusetts), the judge found that the market for compounding pharmacists in the Tucson, Arizona, area was substantially the same as in the Newton area, and that there was no reason to speculate that the mother would be any more successful in run-

---

October 23, 1993, and the judge's amended memorandum of decision was issued September 13, 2005.

[6]The daughter lives with her father, notwithstanding the divorce judgment order indicating that she was to live primarily with her mother. In the three months prior to trial, the daughter had seen her mother once. The report of the Middlesex County Probate and Family Court's family service clinic, which investigated this issue, indicated "that the [mother] possessed poor judgment skills on children issues, and recommended that [the daughter] remain in the [father's] custody."

[7]While the mother had done some research into Tucson, Arizona, schools, the judge found that the Newton schools were superior, and thus it would be beneficial for the son to remain in the Newton school system.

[8]She was also "estranged from her parents and sisters in the Newton area but ha[d] reestablished her relationship with her parents."

[9]The mother testified that she would stay in the Commonwealth if removal were not allowed.

ning a nutriceuticals business in Arizona than she had been in Massachusetts. Finally, while the son had a good relationship with Seder, his sister, who apparently blamed Seder for breaking up her parents' marriage, plainly did not, refusing to stay in the couple's newly purchased home in Arizona.[10]

The father currently lives within one and one-half miles of his son, allowing him to participate in his son's life on a regular basis through sports, school events, and other traditional modes of parental involvement. The boy's sister, with whom the boy has, as noted, a "tight" relationship, resides with the father, and her inability to accept her mother's new fiancé would prevent easy visitation between the siblings.[11] A cross-country visitation program would impose significant stress on the son,[12] exceeding the speculative benefit of the stress relief cited by the mother as an impetus for her relocation.

The situation here is markedly similar to *Dickenson* v. *Cogswell*, 66 Mass. App. Ct. at 444-446. The mother in *Dickenson* sought to move to California with her new husband. In affirming the denial of her request for removal, this court expressed concerns with cross-country visitation, removal of a child from his network of extended family, termination of the father's common interactions with his son through sports and school-related activities, and the strength of the father-son bond — the very concerns raised here.

Here, as in *Dickenson*, the mother's proffered reasons for removal, balanced against the relevant factors weighing against

---

[10]The judge, to his credit, considered factors favoring the mother, e.g., the fiancé would provide the mother with financial security so that she could work part-time, thereby making her available more for the son, and the GAL recommended that the mother be allowed to remove the son to Arizona. Countering this was the report of the family service clinic which indicated "that if [the son] was removed to Arizona, it would result in undue stress for both children." The GAL and the family service clinic had many differing conclusions. Unquestionably, the judge was free to decide which evidence to credit and how much weight to give it.

[11]I realize that the daughter (born October 31, 1989) may, at some time, go to college, perhaps away from the local area. This apparently was not an issue at trial.

[12]The son's lack of social connections in Arizona adds to his potential discomfort.

relocation, simply do not provide for the best interests of her two children.

On the merits, given the judge's findings, this does not appear to me to be a particularly close case. Indeed, most of the mother's arguments address weight, typically a losing proposition. This appears to be a straightforward instance where the advantage of relocation to the mother is outweighed — clearly, I would assert — by doing what is best for her children. The interests of all of the parties were appropriately addressed and a decision rendered thereupon, which reached a correct conclusion: that it is in the best interests of both children that the son not be removed. I would, thus, affirm the decision of the trial judge.