NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1601                                         Appeals Court

        MARCI ROSENWASSER  vs.  RONALD ROSENWASSER.

                        No. 14-P-1601.

    Middlesex.      January 25, 2016. - June 17, 2016.

         Present:  Cohen, Trainor, & Katzmann, JJ.


Divorce and Separation, Child custody, Child support, Alimony,
    Modification of judgment, Separation agreement.  Minor,
    Custody.  Parent and Child, Custody, Child support.



     Complaint for divorce filed in the Middlesex Division of
the Probate and Family Court Department on June 16, 2010.

     An amended complaint for modification, filed on August 28,
2012, was heard by Patricia A. Gorman, J.


     Susan E. Stenger for the father.
     Donald G. Tye (Michelle M. Rothman with him) for the
mother.


     KATZMANN, J.  Ronald Rosenwasser (father), the former

husband of Marci Rosenwasser (mother), appeals from a

modification judgment of the Probate and Family Court denying

his request to remove the parties' minor child to Boca Raton,

Florida.  As the father is the child's primary custodial parent,

his removal request is governed by the two-prong "real advantage" test set forth in Yannas v. Frondistou-Yannas, 395 Mass. 704 (1985) (Yannas). Though we credit the judge's efforts to deal with a complex situation involving two loving parents, we conclude that the judge erred in her application of the second prong of the Yannas test, by not adequately considering the best interests of the child and the interests of the father, while giving undue weight to the interests of the mother. We therefore vacate the portion of the modification judgment denying the father's removal request and remand the matter to the Probate and Family Court for further proceedings consistent with this opinion.

The mother also cross-appeals from the portion of the modification judgment reducing the father's support obligation. We vacate the portion of the modification judgment pertaining to support and remand the matter for additional findings consistent with this opinion.

Background. "We summarize the proceedings, setting forth relevant background facts as determined by the judge, supplemented by the record where necessary, and reserving other facts for our later discussion of the issues." Murray v. Super, 87 Mass. App. Ct. 146, 147 (2015) (Murray). The parties married in March, 1990, and lived together in Florida until 1997, when they relocated to Massachusetts. The father grew up in Florida,

and much of his extended family still lives there.  The mother's parents, who are Canadian citizens, also live in Florida approximately five months out of the year.  The father is one of three partners in a small law firm that has offices in Florida, Massachusetts, and Kentucky.  Each partner operates primarily out of one office and is responsible for bringing in his own business and profits.  The father works primarily out of the Newton, Massachusetts, office and also works out of the Boca Raton, Florida, office approximately one week per month.  The father employs one associate in the Newton office, as well as two paralegals and a shared bookkeeper in the Boca Raton office.

After nearly twenty years of marriage, the parties separated in February, 2010.  Shortly thereafter, in May, 2010, the mother gave birth to the parties' daughter (child).  In October, 2011, the parties were divorced pursuant to a separation agreement that was incorporated and merged into a judgment of divorce.[1]  The separation agreement provided the mother with primary physical custody of the child, and the father with "liberal parenting time".  The separation agreement required the father, as the family's sole wage earner, to pay the mother "base unallocated family support" of $42,000 per year

---

[1] The parties' separation agreement was merged with the judgment of divorce and therefore did "not survive the judgment as an independent contract."  Huddleston v. Huddleston, 51 Mass. App. Ct. 563, 564 n.2 (2001).

and "additional support" equivalent to a percentage of his earned income between $120,000 and $350,000. He was not required to pay such "additional support" on income earned in excess of $350,000.

It is undisputed that, almost immediately after the divorce, the mother became unable to care for the child due to her ongoing mental health issues, including depression and anxiety. The father quickly took over as the child's primary caretaker, while continuing to operate his law practice. The child was enrolled in full-time daycare, and the father also used paid babysitters to provide additional childcare coverage during non-daycare hours. Because the mother was unable to care for the child for extended periods of time, the father took the child with him on his monthly business trips to Florida.

In February, 2012, the father filed a modification complaint seeking primary physical custody and a reduction in his support payments to reflect "the reality" of the changed parenting arrangement. In August, 2012, the father was permitted to amend his complaint to include a request to remove the child to Florida, on the basis that he "has no support system in Massachusetts to assist him with the child[,]" his "family (including the child's grandparents) and friends live in Florida," his law firm's "main office, partners and staff" are in Florida, and he would "have more income available for the

child if he were to move to Florida" and operate solely out of the Boca Raton office, as there is a "considerable cost in maintaining offices in both states."  In August, 2013, the parties entered into a partial modification agreement, which was incorporated into a judgment, transferring primary physical custody of the child to the father and providing the mother with parenting time on Thursday afternoons and overnight visits on alternating weekends.  The remaining issues, including the father's requests for removal and reduced support payments, went to trial.

During the five-day trial, which began in August, 2013, and concluded in January, 2014, the judge heard testimony from the father, the mother's parents, and the mother's court-appointed guardian ad litem (GAL).[2]  The mother did not testify.  It is undisputed that, from the time of the divorce in October, 2011, until the start of the modification trial in August, 2013, the mother missed the majority of her parenting time.  However, during the five-month period in which the trial was pending, the

---

[2] We note that the GAL in this case was a category D GAL or "next friend" appointed to represent the mother's interests. This is distinct from a GAL appointed to evaluate (category E) or investigate (category F) custody-related issues in a domestic relations case.  See Annual Report of Fee-Generating Appointments Pursuant to Supreme Judicial Court Rule 1:07 for Fiscal Year 2016 at 25-27.

mother "was able to exercise all of her scheduled parenting time."

On July 22, 2014, the Probate and Family Court entered a modification judgment which, among other things, denied the father's removal request and substantially reduced his support obligation to the mother. In denying the removal request, the judge concluded that while the move to Florida would provide the father with a "real advantage," it was not in the child's best interests. The instant appeal followed.

Discussion. "We review the judgment and the subsidiary findings of fact for abuse of discretion or other error of law." Murray, 87 Mass. App. Ct. at 148. "'[A] judge's discretionary decision constitutes an abuse of discretion where we conclude the judge made a clear error of judgment in weighing the factors relevant to the decision, such that the decision falls outside the range of reasonable alternatives.'" Hoegen v. Hoegen, 89 Mass. App. Ct. 6, 9 (2016), quoting from L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). "Although we will not substitute our judgment for that of the probate judge, we will 'scrutinize without deference the propriety of the legal criteria employed by the trial judge and the manner in which those criteria were applied to the facts.'" Whelan v. Whelan, 74 Mass. App. Ct. 616, 620 (2009), quoting from Kelley v.

Kelley, 64 Mass. App. Ct. 733, 739 (2005) (additional citation omitted).

1.  Removal.  A parent, against the objection of the other parent, may remove a minor child from the Commonwealth "upon cause shown."  G. L. c. 208, § 30.[3]  "In determining whether cause for removal by the parent with primary physical custody has been shown under the statute, the judge must consider the custodial parent's request under the familiar two-prong 'real advantage' test" articulated in Yannas, 395 Mass. at 710-712. Murray, supra at 149.  The judge must first consider whether the move provides a "real advantage" to the custodial parent. Yannas, supra at 711.  If that threshold prong is met, the judge must then determine whether the move is in the child's best interests.  Ibid.  We address each of the Yannas prongs in turn.

A.  Real advantage.  "To satisfy the real advantage test, the custodial parent must demonstrate 'the soundness of the reason for moving, and the . . . absence of a motive to deprive the noncustodial parent of reasonable visitation.'"  Murray, supra, quoting from Yannas, supra.

_____

[3] "A minor child of divorced parents who is a native of or has resided five years within this [C]ommonwealth and over whose custody and maintenance a [P]robate [C]ourt has jurisdiction shall not, if of suitable age to signify his consent, be removed out of this [C]ommonwealth without such consent, or, if under that age, without the consent of both parents, unless the court upon cause shown otherwise orders. . . ."  G. L. c. 208, § 30, as amended through St. 1986, c. 462, § 9.

Here, the judge concluded that the move to Florida would provide a real advantage to the father as his "income would improve or stay the same, his business overhead costs would diminish, and his emotional support system would be stronger." The judge specifically found that the father's family members living in Florida, including his "mother, brother, sister-in-law, as well as many cousins and nieces and nephews, give him emotional and physical support in the care of [the child]" and assist him with "daily chores, such as shopping and cleaning, so that he may balance work and childcare." While not addressed in the judge's findings, it appears from the record that the father has only one relative, a cousin, living in Massachusetts. The judge also found that the father's income has "decreased each year since he gained sole physical custody" of the child,[4] thus

---

[4] The judge found that the father earned $200,360 in 2011, $147,000 in 2012, and $70,000 from January to October, 2013. The mother contends that the judge mistakenly found a "pattern of decrease" in the father's income, as there was only a "small decrease" in his income from 2011 to 2012, and his 2013 income did not include his annual K-1 distribution typically received the following calendar year. We do not agree that the nearly twenty-seven percent decrease in the father's income from 2011 to 2012 is "small," nor do we find error in the judge's determination of the father's 2013 income. The judge apparently credited the father's testimony that he had earned a total of $70,000 as of October, 2013. There is no indication that the mother sought supplemental evidence of the father's income earned after that date. The judge was therefore within her discretion to determine the father's income based on the available evidence and on her assessment of the father's credibility. See Johnston v. Johnston, 38 Mass. App. Ct. 531,

he would benefit financially from Florida's lower cost of living and from the reduction in his business expenses by operating out of a single office.[5]

"Relocating in order to . . . develop emotional support is a sincere reason," Altomare v. Altomare, 77 Mass. App. Ct. 601, 607-608 (2010) (Altomare), as is the opportunity to improve one's financial circumstances.  See Williams v. Pitney, 409 Mass. 449, 455-456 (1991) (Williams); Cartledge v. Evans, 67 Mass. App. Ct. 577, 580 (2006) (Cartledge); Wakefield v. Hegarty, 67 Mass. App. Ct. 772, 777 (2006) (Wakefield); Woodside v. Woodside, 79 Mass. App. Ct. 713, 718 (2011).  As reflected in the judge's findings, the father stood to benefit both emotionally and economically from the proposed move, and there was no indication that he sought to deprive the mother of access to the child.  The mother nevertheless contends that the father's purchase of a home in Auburndale, Massachusetts, shortly before seeking removal demonstrates his lack of

---

536 (1995) (credibility assessments are "close to immune from reversal on appeal except on the most compelling of showings").

[5] The judge declined to credit the father's testimony that the presence of his family in Florida would reduce his childcare costs because he spent roughly the same amount on babysitting (approximately $350 per week) in both Florida and Massachusetts.  However, the child was enrolled in daycare in Massachusetts, but not in Florida.  The findings do not address whether the father was able to avoid incurring daycare expenses in Florida by relying on his family members for childcare.

sincerity with respect to the proposed move. The judge noted, in both the findings and the rationale, that the father closed on his Auburndale home in July of 2012, approximately one month before he amended his modification complaint to include the removal request. However, there is no indication that the judge viewed the timing of these events as reflective of an ulterior motive on the part of the father when seeking removal.[6] We therefore conclude that the judge did not err in finding a real advantage to the father, and we continue our inquiry to the second Yannas prong.

B. Best interests of the child. Once the custodial parent has "establishe[d] a good, sincere reason for wanting to remove to another jurisdiction," the judge must then consider whether the move is in the child's best interests. Yannas, supra at 711. This involves the weighing of several factors, including "(1) whether the quality of the [child's] li[fe] will be improved, including any improvement that 'may flow from an improvement in the quality of the custodial parent's life'; (2)

---

[6] The mother further argues that the father was seeking to deprive her of contact with the child, as demonstrated by the judge's conclusion that the father has not "shown an interest in fostering" the mother's relationship with the child. We note that the judge also concluded that the father "has not shown an active interest in interfering with" the relationship between the mother and the child. Indeed, if the judge believed the father had an improper motive for seeking removal, she would have made an express finding to that effect. We are therefore unpersuaded by the mother's argument.

any possible 'adverse effect of the elimination or curtailment of the [child's] association with the noncustodial parent'; (3) 'the extent to which moving or not moving will affect the [child's] emotional, physical, or developmental needs'; (4) the interests of both parents; and (5) the possibility of an alternative visitation schedule for the noncustodial parent." Murray, 87 Mass. App. Ct. at 150, quoting from Dickenson v. Cogswell, 66 Mass. App. Ct. 442, 447 (2006) (Dickenson). As Yannas teaches, "none of the relevant factors" are "controlling" and the "judicial safeguard" of each person's interest "lies in careful and clear fact-finding." Yannas, supra at 711-712. We therefore examine the judge's findings as they pertain to each of the aforementioned relevant factors.

i. The child's quality of life. With respect to the child's quality of life in Massachusetts, the judge found that the child was attending a "prestigious" daycare program at the time of the trial. However, there is no indication as to whether the child had developed any friendships or was involved in any activities in Massachusetts. Compare Altomare, supra at 608 ("Here, the judge found that the children had many friends . . . and were engaged in a variety of activities, and that a relocation would negatively affect those relationships and activities") Moreover, it appears from the record that the child has little, if any, extended family in Massachusetts.

In contrast, the judge found that the child "is close with her paternal family in Florida" and she has "already spent significant time in Boca Raton . . . ." The judge also found that the child's maternal grandparents live in Boca Raton approximately five months per year. The judge concluded that the move to Florida "would have advantages for [the child], such as living closer to her paternal family, seeing her maternal grandparents when they are in the area, and a decrease in [the father's] travel for work." While the judge identified some advantages resulting from the move, the findings do not address the benefits to the child "'flow[ing] from an improvement in the quality of the [father's] life[.]'" Murray, supra at 150, quoting from Dickenson, supra at 447. There are no findings regarding the extent to which the father's improved financial circumstances in Florida could also improve the child's quality of life. See, e.g., Williams, 409 Mass. at 455 ("financial stress on the mother . . . if not allowed to move would adversely affect the children"); Wakefield, supra at 777 ("the move would result in an improvement in the life of the mother that would inure to the child's benefit"). This is especially important where, as in this case, the father is the child's sole source of economic support. Moreover, there is no discussion of the potential benefits to the child resulting from the father's increased happiness living in Florida. See Pizzino v. Miller,

67 Mass. App. Ct. 865, 870 (2006) (Pizzino) ("Common sense demonstrates that there is a benefit to a child in being cared for by a custodial parent who is fulfilled and happy rather than by one who is frustrated and angry"); Altomare, supra at 608 ("It is undisputed that a parent's happiness can affect the quality of parenting").

ii. The child's relationship with the mother. Of the 185 findings of fact, only one squarely addresses the nature of the child's relationship with the mother. The judge found that the mother and the child "have a very close bond and do many activities together." However, the nature of those activities are not specified, nor are there any subsidiary findings to support the conclusion regarding their "close" bond. Likewise, while the judge concluded that the child's "routine" with the mother "would be greatly disturbed" if removal were allowed, there are no specific findings regarding their routine which would support such a conclusion.

It is undisputed that, during the two years leading up to the modification trial, the mother missed the majority of her parenting time. It was not until the commencement of trial that the mother began exercising her parenting time on a regular basis. Moreover, the longest period that the mother has ever cared for the child was three consecutive nights. Although the mother's exercise of her parenting time was historically

inconsistent, the judge concluded that her relationship with the child "would suffer the most" if the father were permitted to remove the child to Florida. Such a conclusion "must be grounded in specific subsidiary fact-finding to support it[,]" Katzman v. Healy, 77 Mass. App. Ct. 589, 597 (2010) (Katzman), which did not occur here. Compare Dickenson, supra at 446, 450 (the judge concluded that the noncustodial father enjoyed "a very close" relationship with the child, as he had "been a regular part of the child's everyday life in Massachusetts, coaching the child's athletic teams, picking him up from school or daycare," and taking the child on "numerous skiing, hiking, and camping vacations"); Murray, supra at 152 ("The judge found that the [noncustodial] father ha[d] a strong bond with the children, [wa]s an active and involved parent, coache[ed] them in their athletic activities, attend[ed] church regularly with them, and ha[d] never missed parenting time with them").

iii. The child's emotional, physical, and developmental needs. Apart from noting that the child "has a nut allergy and asthma" requiring "nebulizer treatments and an epipen at all times," the judge did not find the child to have any unique needs. Though not addressed in the findings, it appears from the record that the child is generally well-adjusted, and was thriving in her daycare program at the time of the trial.

The judge noted that the child was slated to enter kindergarten in the Fall of 2015.  While the judge credited the father's testimony that "the school district in Boca Raton" is "very good," she nevertheless concluded that the move would disadvantage the child insofar as "Massachusetts offers better schools and cultural opportunities in general."  However, the judge did not make any subsidiary findings demonstrating that Massachusetts has "better" schools.  Even if she had made such findings, they would "not compel the conclusion" that Boca Raton's school system is "not appropriate to the [child's] needs."  Abbott v. Virusso, 68 Mass. App. Ct. 326, 333 n.12 (2007) (Abbott).

iv.  Interests of both parents.  With respect to the mother, the judge found that she has been receiving mental health treatment for more than a decade, and has been "suffer[ing] from anxiety and depression since at least the end of the marriage."  The judge found that the mother's "mental health issues have interfered with her ability and confidence with respect to parenting [the child]."  The judge further found that, "[w]hether or not he does so knowingly," the father's "aggressive pursuit of 'fairness' often triggers [the mother's] anxiety and undermines her confidence."  However, the judge determined that the mother's "mental health status has been improving" since she switched doctors and medications in May,

2013, causing her to become "more comfortable" with the child. The judge found that the mother has "worked hard to reestablish a relationship" with the child, has had "a near perfect record of parenting time since the beginning of trial[,]" and "hopes to expand her parenting time in the future."

In contrast, there were few findings regarding the father's interests and his relationship with the child. While the judge concluded that the father would benefit financially and emotionally from the move to Florida, the findings do not address the hardship that the father would experience by remaining in Massachusetts. At trial, the father testified that he had been "under tremendous pressure" since becoming the child's primary caretaker, and as a result, "everything else [wa]s suffering," including his "work, . . . personal life, [and] . . . health." While the judge found that the father had recently started receiving treatment for depression and anxiety, the findings do not reflect consideration of the stress experienced by the father as a full-time working parent without a support system in Massachusetts. This "less than full appreciation of" the obvious challenges facing the father as the child's primary caretaker and the family's sole wage-earner effectively minimized his interest in obtaining a support system and greater financial security in Florida. Cartledge, 67 Mass. App. Ct. at 580 n.3. Insofar as the father's interests were

not adequately considered, the "direct and immediate impact[s of those interests] on the welfare of the [child]," <u>Pizzino</u>, 67 Mass. App. Ct. at 875, were not given their due.

v. <u>Reasonable alternative parenting plan</u>. The father proposed two different alternative parenting plans, both of which the judge rejected. The father suggested either that the current parenting plan remain intact, with the mother exercising her regularly-scheduled parenting time in Florida, or that the mother could exercise longer blocks of parenting time during the child's school breaks. The judge made no detailed findings regarding the practical repercussions of implementing the father's proposed alternative parenting plans. Instead, the judge concluded that neither plan was a "reasonable accommodation" in light of the mother's mental health issues. The judge determined that the mother would "be unlikely to exercise her parenting time" under either plan, which would "damage" both the mother and the child. The judge found that a schedule placing the child in the mother's care for more than three consecutive nights during school breaks was not "workable," and the mother could not handle "frequent plane trips" to Florida, which would be "expensive and anxiety-producing." However, the judge made no specific findings, nor does there appear to have been any evidence, demonstrating that the mother's mental health status renders her unable to travel

to Florida.[7]  Nor are there any findings regarding the impacts of the mother's flexible schedule, the fact that her parents own a vacation home in Boca Raton, and the possibility of offsetting her travel expenses by increasing the father's support payments. See Hale v. Hale, 12 Mass. App. Ct. 812, 820 (1981) (Hale) (the judge "did not consider whether support payments could be" adjusted "to cover visitation expenses"); Yannas, 395 Mass. at 712 (alternative visitation in Greece reasonable where the father was retired and had "large blocks of free time" during which to travel); Wakefield, 67 Mass. App. Ct. at 778 (father's support payments reduced "in anticipation of [his] costs of travel to and from St. Croix").

C.  Balancing real advantage with the child's best interests.  The judge found that the move was not in the child's best interests, as the "[t]he inability to provide suitable, workable alternative parenting time" for the mother "outweighs" the father's real advantage in moving to Florida.  The father argues that the judge gave "undue -- in effect, dispositive --

---

[7] To the contrary, the judge found that the mother's mental health has been improving since May, 2013, and she has "showed great improvement" in her ability to adhere to a regular parenting schedule.  Moreover, while the judge found that the mother "would be unlikely to feel that she could handle long periods of time" with the child, the judge also found that the mother is "in reality" more capable of caring for the child than she feels and she "hopes to expand her parenting time in the future."

weight" to the disruption of the mother's parenting time. Cartledge, supra at 581, citing Yannas, supra at 711; Hale, supra at 815. We agree.

The judge concluded that while "[m]oving to Florida would provide an advantage" to the father, "remaining in Massachusetts would not be a crushing blow." As we have noted, the findings do not address the father's interest in moving to Florida and the extent to which his increased happiness and improved financial circumstances would also benefit the child. However, "[u]nder Yannas, the advantages and disadvantages of moving or not moving to the parent who has sole physical custody are a significant factor in the [best interests of the child] equation." Katzman, 77 Mass. App. Ct. at 595-596 (internal citation omitted). See also Abbott, 68 Mass. App. Ct. at 333 (judgment vacated where the findings contained "no mention of the [custodial parent's] interests"). This is because the "best interests of a child are so interwoven with the well-being of the custodial parent." Altomare, 77 Mass. App. Ct. at 603-604, quoting from Yannas, supra at 710 (additional citation omitted).

Instead, the judge emphasized the mother's recent efforts to "reestablish" a relationship with the child. At the start of the modification trial, the child was three years old and the mother had missed the majority of her parenting time for nearly two years. This is not insignificant. While the mother's "near

perfect" adherence to the parenting schedule during the five months in which the trial was pending is commendable, it does not erase the substantial time that she already missed. By minimizing the consequences of the mother's missed parenting time, the father's overwhelming contributions to the child's upbringing during that period (reflected in the totality of the findings) were also effectively minimized. Indeed, if the noncustodial parent "has not exercised [her] rights of visitation," the resolution of the removal question "is less difficult than in the case of a diligent noncustodial parent." Yannas, supra at 711.

We recognize the inherent difficulty in deciding a removal case where there is no question that both parties are loving parents. We also appreciate, as we noted at the outset, the judge's efforts to sort out the complex concerns. We nevertheless conclude that the judge abused her discretion by placing disproportionate emphasis on the effect of the move on the mother's relationship with the child, while failing to adequately weigh the interests of the father and the child. "[D]isruption in visitation with the noncustodial parent cannot be controlling or no removal petition would ever be allowed." Cartledge, 67 Mass. App. Ct. at 581. Accordingly, we vacate the portion of the modification judgment denying the father's removal request.

The decision of whether to reverse, rather than to remand for further findings, presents a close question, as we conclude with the benefit of distance not available to the trial judge that this record arguably establishes that the father's removal request should have been allowed.[8] See Rosenthal v. Maney, 51 Mass. App. Ct. 257, 272 (2001). However, out of an abundance of caution, we remand the matter for a redetermination of the best interests of the child. On remand, the judge should make detailed findings regarding the father's interests, including the extent to which the father's unhappiness in Massachusetts affects the child's well-being, and the impact of economic and emotional benefits resulting from the move on the child's quality of life. In addition, the judge should make detailed findings regarding the child's needs, and her relationship and routine with both parents. Furthermore, the judge should assess the reasonableness of the father's alternative parenting plans

---

[8] Indeed, at one point during the modification trial, the judge indicated to counsel that the evidence appeared to support allowing removal. The judge specifically stated that, "in this case, what I have is a mother who . . . cannot for reasons beyond her control spend time with her child. Her support system is in Canada . . . . [The father] could make his life and his child's life easier going to Florida, [and] he could probably be more productive in Florida . . . . When he started his office here 15 years ago, he didn't know he would have a three-year-old daughter which shifts everything as far as trying to run a law practice and trying to produce money . . . . [A]t this point, I'm starting to see evidence that would support a removal. . . . I'm not prejudging, but I'm just saying that right now it's just kind of weighing to one side."

(including any new, or more detailed, proposals that he seeks to submit), and any parenting plans proposed by the mother if removal is allowed and if removal is denied. Given the passage of time, the judge may consider supplemental evidence, including relevant evidence of events which have transpired since the end of the modification trial.

2. <u>Alimony</u>. At the time of the divorce, the father agreed to pay the mother "base unallocated family support" (combined child support and alimony) of $807.69 per week ($42,000 per year). The "base" support amount represented thirty-five percent of the father's $120,000 annual "base" income at that time. The father also agreed to pay the mother "additional support" equivalent to thirty-five percent of any income that he earned between $120,000 and $250,000, and twenty-eight percent of any income that he earned between $250,000 and $350,000.[9] Any "additional support" was to be paid by the father in one annual "true up" payment no later than April 15.

In the modification judgment, the judge reduced the father's "base support" obligation to $433 per week. In her findings, the judge characterized the reduced support award as "pure alimony[,]" concluding that unallocated support was "no longer appropriate" as the father was now the child's primary

---

[9] The father was not obligated to pay such "additional support" on income earned in excess of $350,000.

custodial parent. In arriving at the $433 base support figure, the judge found the father's gross alimony obligation to be $528 per week, representing 32.5 percent of his "base" income of $1,625 per week ($84,500 per year). The judge then deducted the mother's new child support obligation of $95 per week from the father's gross alimony obligation, resulting in a net alimony payment of $433 per week. The judge also ordered the father to "continue his annual 'true up'" by paying the mother "additional support" equivalent to twenty-seven percent of his income between $120,000 and $250,000, and twenty percent of his income between $250,000 and $350,000.

The mother challenges the modification judgment insofar as it does not award any alimony on the father's earned income between $84,500 and $120,000. The mother asserts that because there is nothing in the judge's "findings or rationale justifying this gap[,]" the judge should have lowered the "true up" threshold to $84,500 to remain consistent with the separation agreement.[10]

---

[10] The mother also attacks the alimony award by reasserting her argument that the judge erred in her calculation of the father's income at the time of the modification trial. See n.4, supra. As we previously discussed in connection with the removal issue, we discern no error in the judge's determination of the father's income. We thus reject this argument as it relates to alimony, as well.

"When parties to a divorce negotiate an agreement for alimony that is incorporated and merged into" a judgment of divorce, "the judgment . . . is subject to modification based on a material change in circumstances." Chin v. Merriot, 470 Mass. 527, 534-535 (2015) (Chin).[11] However, "[e]ven where provisions regarding alimony in a separation agreement are merged and do not survive the divorce judgment, 'it is nevertheless appropriate for a judge to take heed of the parties' own attempts to negotiate terms mutually acceptable to them' when determining whether to modify . . . alimony." Id. at 535 (2015), quoting from Pierce v. Pierce, 455 Mass. 286, 302, (2009) (Pierce), quoting from Bercume v. Bercume, 428 Mass. 635, 644 (1999) (Bercume). Accordingly, we "'review the findings to determine whether the judge gave appropriate consideration to the parties' intentions as expressed in their written agreement, . . . and to any changes in their circumstances since the last modification judgment[,]'" Cooper v. Cooper, 62 Mass. App. Ct. 130, 134 (2004), quoting from Huddleston v. Huddleston, 51 Mass. App. Ct. 563, 568 (2001), while also "keep[ing] in mind that 'the statutory authority of a court to award alimony continues

---

[11] As the divorce judgment that established the original support order entered prior to the effective date of the Alimony Reform Act of 2011, G. L. c. 208, §§ 48-55, we apply "the standards for modification existing at the time the judgment entered . . . ." Chin, supra at 535.

to be grounded in the recipient spouse's need for support and the supporting spouse's ability to pay.'" Pierce, supra at 295-296, quoting from Gottsegen v. Gottsegen, 397 Mass. 617, 624 (1986).

In the present case, it appears that the judge attempted to take "into account the earlier, expressed desires of the parties[,]" Katzman, 77 Mass. App. Ct. at 598, quoting from Bercume, supra, by maintaining the "base support" and "true up" paradigm established in the separation agreement. Moreover, it is apparent from the judge's findings that she deemed the change in custody and the resulting decrease in the father's "base" annual income, from $120,000 to $84,500, to constitute a material change in circumstances warranting a reduction in the father's support payments. However, while the judge used the father's reduced income of $84,500 to calculate his "base" support obligation, she did not lower the "true up" threshold to reflect his reduced income.

As the mother correctly asserts, this results in no alimony being paid on the father's income between $84,500 and $120,000. There is no explanation in the judge's findings or rationale regarding the basis for this $35,500 gap. The father now contends (for the first time on appeal) that the judge was unable to apply the "true up" formula to the gap without creating a "self-modifying" order in violation of Hassey v.

Hassey, 85 Mass. App. Ct. 518, 528 (2014) (Hassey). However, this line of reasoning "does not appear either explicitly or by clear implication" in the judge's findings or rationale. Putnam v. Putnam, 5 Mass. App. Ct. 10, 17 (1977). We are therefore left to speculate as to the judge's rationale for failing to award alimony on the father's income between $84,500 and $120,000.[12]

We are similarly unable to discern whether the judge considered the father's ability to pay and the mother's need for alimony when modifying the support award. "If a supporting spouse has the ability to pay, the recipient spouse's need for support is generally the amount needed to allow that spouse to

---

[12] While we need not reach the question of whether Hassey would preclude the judge from applying the "true up" formula to father's income between $84,500 and $120,000, we note that Hassey appears to be distinguishable from the case at bar. In Hassey, an appeal from a divorce judgment, the judge fashioned an alimony award containing a "self-modifying feature" that required the husband to pay thirty percent of his income over $250,000. This court vacated the self-modifying award as it was "not based on a judicial determination, supported by subsidiary findings of fact, of an increase in the wife's need accompanied by the husband's ability to provide for the same." Hassey, supra at 528, citing Pierce, supra at 293. Here, the judge was faced with the task of modifying a self-executing alimony formula contained in the parties' separation agreement. A judge is expected to take into account the terms negotiated by the parties at the time of the divorce when modifying the divorce judgment. See Katzman, supra at 598. Accordingly, on the record before us, we see nothing in Hassey that would prevent a judge from fashioning a modified alimony award that incorporates a "self-modifying feature" previously agreed-upon by the parties.

maintain the lifestyle he or she enjoyed prior to termination of the marriage." Pierce, supra at 296.  Here, while the judge indicated in her rationale that she had "adjusted" support "to fit the reality of the custody schedule and financial situations of the parties[,]" her findings regarding the parties' respective financial positions are extremely limited.  The judge found the mother's sole source of income to be the support that she receives from the father.  Both parties submitted detailed financial statements at trial indicating weekly expenses that substantially exceeded their respective incomes.  However, the judge made virtually no findings as to whether those reported expenses were reasonable or even credible.[13]  Likewise, there was no mention in the judge's findings as to the parties' lifestyle during the marriage.  On this record, it is impossible to determine whether the judge considered all of the relevant factors necessary to properly assess the mother's need for alimony and the father's ability to pay.  See Greenberg v. Greenberg, 68 Mass. App. Ct. 344, 347 (2007), quoting from

---

[13] Nearly all of the judge's findings regarding the parties' financial circumstances pertained to the father.  The judge found that, at the time of the modification trial, the father paid $1,030 per week toward the mortgage on his home in Auburndale, Massachusetts.  The judge found that the mother lived in a rented home in Auburndale and that her parents had paid her rent through July, 2014.  The judge further found that the father spent approximately $350 per week on babysitters and $338 per week on health insurance coverage for himself, the mother, and the child.

Schuler v. Schuler, 382 Mass. 366, 375-376 (1981) (these factors include "'the financial status of the support provider, and the station in life of the respective parties,' as well as whether, on all of the economic circumstances, the obligor spouse has 'the present ability to pay the amounts required by the agreement and judgment'").  See also Adlakha v. Adlakha, 65 Mass. App. Ct. 860, 869 (2006) ("Without the benefit of the judge's fact finding regarding the [mother's] reasonable needs, we must speculate to discern the basis" for the alimony award).  Accordingly, "the gaps in the judge's fact finding and analysis require a remand to resolve the questions concerning alimony . . . ."  Id. at 871.

III.  Conclusion.  The portions of the July 22, 2014, modification judgment denying the father's removal request and reducing the father's support obligation are vacated, and the matter is remanded to the Probate and Family Court for further proceedings consistent with this opinion.  In view of the length of time that has transpired since the trial, the judge may choose to consider taking additional evidence as to the parties' current circumstances.  The judge should resolve the remanded issues as expeditiously as possible to avoid further delay in the conclusion of this case.

In all other respects, the judgment is affirmed. Pending final disposition, the judge may make such temporary orders for the payment of alimony as she may deem appropriate.

<u>So ordered</u>.